denial of his motion to dismiss. He now does so. On appeal, Giacalone argues that his prior plea agreement precluded the government from charging him with the count to which he pled guilty—namely, a RICO conspiracy based upon the collection of unlawful debts.

Giacalone points out that count two of the indictment incorporates paragraph four from count one, which outlines the scope of the criminal enterprise and references "obstruction of justice" as an activity of the Detroit Cosa Nostra. The government responds that this general obstruction of justice charge did not necessarily refer to the Forman incident. More importantly, the government notes that neither the conspiracy to collect unlawful debts charged in count two nor the predicate acts that made up that conspiracy had any connection to the Forman incident whatsoever. Count two of the indictment incorporated paragraphs one through five of count one only to provide general background as to the Detroit Cosa Nostra. We conclude that, in this context, mention of the words "obstruction of justice" did not constitute a violation of the government's promise not to charge Giacalone in connection with the Forman incident.

### III. CONCLUSION

For all of the reasons set forth above, we **VACATE** the convictions and sentences of Corrado and Tocco and **REMAND** for a *Remmer* hearing. If the district court finds that these defendants were prejudiced by jury misconduct, then they will be entitled to a new trial. If not, then their convictions should be reinstated and they should be resentenced, this time with the district court setting out its findings as to contested factual matters pursuant to Rule 32(c)(1) of the Federal Rules of Criminal Procedure. Finally, we **AFFIRM** the district court's denial of Giacalone's motion to dismiss.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0280P (6th Cir.)
File Name: 00a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

     *v.*                              Nos. 98-2269/
                                       2270/2365

PAUL CORRADO (98-2269);
NOVE TOCCO (98-2270);
VITO WILLIAM GIACALONE
(98-2365),
     *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80201—John Corbett O'Meara, District Judge.

Argued: June 16, 2000

Decided and Filed: August 24, 2000

Before: WELLFORD, NELSON, and GILMAN, Circuit
Judges.

_____

#### COUNSEL

**ARGUED:** Robert M. Morgan, Detroit, Michigan, Harold Z. Gurewitz, GUREWITZ & RABEN, Birmingham, Michigan, Neil H. Fink, LAW OFFICES OF NEIL H. FINK,

Birmingham, Michigan, for Appellants. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Robert M. Morgan, Detroit, Michigan, Harold Z. Gurewitz, Margaret Sind Raben, GUREWITZ & RABEN, Birmingham, Michigan, Neil H. Fink, LAW OFFICES OF NEIL H. FINK, Birmingham, Michigan, for Appellants. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

### OPINION

---

RONALD LEE GILMAN, Circuit Judge.    This case involves three codefendants convicted of conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), as alleged members of the Detroit Mafia.    Two of the defendants, Paul Corrado and Nove Tocco, raise substantially similar arguments on appeal, challenging the scope of the voir dire, the conduct of the prosecutor, the impartiality of the jury, and the district court's failure to detail its findings at sentencing as required by Rule 32(c)(1) of the Federal Rule of Criminal Procedure.    The third defendant, Vito Giacalone, raises only one issue on appeal, arguing that his motion to dismiss all charges against him should have been granted because, in an earlier plea agreement, the government granted him immunity regarding one of the predicate acts charged in this case.

For the reasons set forth below, we **VACATE** the convictions and sentences of Corrado and Tocco and **REMAND** for a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954).    If the district court finds that these defendants were prejudiced by jury misconduct, then they will be entitled to a new trial.    If not, then their convictions should be reinstated and they should be resentenced, this time with the district court setting out its findings as to contested factual

conspiracy based upon a pattern of racketeering activity) involved the same facts as were charged in *United States v. Forman*.

The government argued in response that the inclusion of the Forman incident as one of many predicate acts within the count one conspiracy charge did not violate Giacalone's prior plea agreement.    In the alternative, the government proposed two suggestions to alleviate Giacalone's concerns.    First, the government suggested that the district court instruct the jury that, in order to convict Giacalone of the RICO conspiracy, it would have to find him guilty of two acts of racketeering *other* than obstruction of justice in connection with the Forman incident.    Additionally, the government proposed a special verdict form that would require the jury to indicate the specific predicate acts of racketeering for which Giacalone was found guilty.

The district court denied Giacalone's motion for dismissal and severance, but announced that "it intends to give defendant Giacalone the full benefit of the Rule 11 Plea Agreement."    Explaining, the court stated that "[t]he government has assured the court of its belief that Mr. Giacalone's rights arising out of the agreement can be protected in a multiple defendant trial."    Presumably, then, the district court intended to adopt the government's suggestions of a limiting instruction and a special verdict form.    The district court then added that "Giacalone's motion to dismiss and/or severance may be renewed if, during discovery or preparation for trial, facts develop which support the argument that a multi-defendant trial would substantially endanger Mr. Giacalone's plea agreement rights."

On January 5, 1998, Giacalone entered into a plea agreement with the government, under which Giacalone pled guilty to count two of the indictment (RICO conspiracy based upon the collection of unlawful debts), in return for the dismissal of all remaining charges against him.    Giacalone reserved the right, however, to appeal the district court's

doubt"); *United States v. Ruggiero*, 100 F.3d 284, 291 (2d Cir. 1996) (affirming the district court's application of the preponderance of the evidence standard to determine the offenses underlying a RICO conspiracy).

The Supreme Court's recent decision in *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000), does not mandate a different result. In *Apprendi*, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2362-63. In this case, Corrado and Tocco faced a maximum sentence of twenty years on the RICO conspiracy counts, disregarding the murder conspiracy. *See* 18 U.S.C. § 1963(a). Because the district court did not sentence either defendant to a term of more than twenty years on the RICO counts, *Apprendi* is not triggered and the existence of a murder conspiracy did not have to be decided by a jury under the reasonable doubt standard.

### G.   Vito Giacalone

Giacalone was indicted in 1992 for his role in inducing Theodore Forman, an attorney with the U.S. Department of Justice, to unlawfully turn over grand jury materials regarding a prior criminal investigation of Giacalone and others. *See United States v. Forman*, 71 F.3d 1214 (6th Cir. 1995). In exchange for a plea of guilty to conspiracy to defraud the United States, the government promised that Giacalone would "not be charged . . . in connection with the theft of Government documents involved in *United States v. Forman*." Giacalone served a three-year sentence for his crime.

In the present case, Giacalone was charged with two counts of RICO conspiracy as well as various counts of extortion under the Hobbs Act. He moved to dismiss all charges against him or, alternatively, for severance, on the ground that one of the predicate acts alleged as part of count one (RICO

matters pursuant to Rule 32(c)(1) of the Federal Rules of Criminal Procedure. Finally, we **AFFIRM** the district court's denial of Giacalone's motion to dismiss.

## I.   BACKGROUND

### A.   Factual background

Corrado, Tocco, and Giacalone were indicted on charges relating to their alleged involvement in the Detroit branch of the national Mafia organization, also known as the Cosa Nostra. Among the twenty-five counts charged were two counts of conspiracy under RICO (one based upon a pattern of racketeering activity and one based upon the collection of unlawful debts), several individual counts of extortion pursuant to 18 U.S.C. § 1951, one count of a Hobbs Act conspiracy, 18 U.S.C. § 1951, and several counts of using or carrying a firearm in relation to a crime of violence pursuant to 18 U.S.C. § 924(c)(1).

### B.   Procedural background

Giacalone pled guilty to one count of RICO conspiracy on January 6, 1998 and was sentenced to a 78-month term of imprisonment and a 2-year term of supervised release. In tendering this plea, Giacalone reserved his right to appeal the denial of a previous motion to dismiss. He filed a timely notice of appeal on November 30, 1998.

On April 29, 1998, the jury convicted Corrado and Tocco on all counts. The district court sentenced Corrado to a term of 97 months of imprisonment on the extortion and racketeering counts, 60 additional months of imprisonment for a related firearm offense, and a 3-year term of supervised release. It sentenced Tocco to a term of 167 months of imprisonment on the extortion and racketeering counts, 60 additional months of imprisonment for a related firearm offense, and a 3-year term of supervised release. Both defendants filed timely notices of appeal on November 6, 1998.

## II.   ANALYSIS

### A.   Law of the case

Three of the challenges raised in the briefs of Corrado and Tocco—regarding the sufficiency of the district court's voir dire, Agent Ruffino's testimony, and three specific instances of alleged prosecutorial misconduct—were considered and rejected by this court in the earlier appeal of Jack Tocco, a codefendant of Corrado's and Tocco's, who appealed individually. *See United States v. Jack William Tocco*, 200 F.3d 401 (6th Cir. 2000). An earlier appellate court's decision as to a particular issue may not be revisited unless "substantially new evidence has been introduced, . . . there has been an intervening change of law, or . . . the first decision was clearly erroneous and enforcement of its command would work substantial injustice." *Miles v. Kohli & Kaliher Assocs., Ltd.*, 917 F.2d 235, 241 n.7 (6th Cir. 1990).

Corrado and Tocco have not demonstrated that such exceptional circumstances exist in the present case. This court's earlier decisions as to those issues are therefore the law of the case and will not be disturbed. *See United States v. Wilson*, No. 91-1510, 1992 WL 179240, at *8 (6th Cir. July 28, 1992) (ruling that a panel's holdings in the appeals of three codefendants became the law of the case as to the identical issues raised in the subsequent appeal of a fourth codefendant); *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990) ("[F]indings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." (citation omitted)).

### B.   Jury tampering

#### 1.   Factual background

On April 15, 1998, only two days before closing arguments were scheduled, an individual later identified as Khalid

cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, *were it sitting as a trier of fact*, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2, application note 5 (emphasis added). In the commentary to the guidelines, the Sentencing Commission explained that "this decision should be made by a reasonable doubt standard." *See* U.S.S.G. App. C, Amend. 75.

The defendants in this case were convicted of a RICO conspiracy, however, not a multi-object conspiracy. There is a critical distinction between the two. The multi-object conspiracy section of the Sentencing Guidelines was "enacted to deal with multiple object conspiracies charged in a single count." *United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993). By contrast, a "RICO conspiracy . . . is considered a single object conspiracy with that object being the violation of RICO." *Id.*; *see also United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984) ("A RICO conspiracy under § 1962(d) based on separate conspiracies as predicate offenses is not merely a 'conspiracy to conspire' as alleged by appellants, but is an overall conspiracy to violate a substantive provision of RICO . . . .").

Thus, the underlying acts of racketeering in a RICO conspiracy are not considered to be the *objects* of the conspiracy, but simply conduct that is relevant to the central objective—participating in a criminal enterprise. The existence of relevant conduct is determined at sentencing by a preponderance of the evidence. *See, e.g.*, *United States v. Voyles*, 995 F.2d 91, 93 n.3 (6th Cir. 1993). At resentencing, then, the district court would only be required to find that the defendants conspired to murder Bowman by a preponderance of the evidence in order for this offense to be used to calculate the defendants' base offense level. *See Carrozza*, 4 F.3d at 80 (holding, in the context a RICO conspiracy, that "the applicability of relevant conduct, need only be proven by a preponderance of the evidence, not beyond a reasonable

sentence that simply adopted the findings of the presentence report as to controverted factual matters violated Rule 32).

We therefore conclude that Corrado and Tocco must be resentenced in compliance with the requirements of Rule 32. Without a record of the district court's findings, we are unable to conduct a meaningful review of its determinations as to the base offense level and specific enhancements that it imposed upon the defendants. We will, however, address one legal issue that was briefed on appeal for the guidance of the district court in the event of resentencing.

### 2.   *Conspiracy to murder*

One of the reasons that the district court fixed Corrado's and Tocco's base offense level for the RICO conspiracy at 28 was because it found that a plot to murder Bowman was one of the objects of the conspiracy. The jury's general verdict of guilty as to the RICO conspiracy count did not indicate whether the jury found that the defendants had actually conspired to murder Bowman.

On appeal, the defendants and the government dispute the burden of proof that the government bears in establishing an underlying offense that was not specified in the jury's verdict in order for that conduct to be used to calculate the defendant's base offense level. Corrado and Tocco maintain that the government is required to prove the existence of an underlying offense beyond a reasonable doubt. The government argues that it is only required to prove that such conduct occurred by a preponderance of the evidence.

The defendants analogize the present context to that of a multi-object conspiracy. When a defendant is sentenced under the multi-object conspiracy guideline, the application notes provide that

> Particular care must be taken . . . because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such

Shabazz approached Corrado and told him that he had a "friend" on the jury and that he could assist Corrado in obtaining a favorable verdict. Corrado's counsel immediately reported the incident to the government and to the district court. Federal agents asked Corrado to contact Shabazz and set up a meeting, which Corrado did. On the evening of April 16, 1998, Corrado, wearing a recording device, met with Shabazz. He attempted to elicit the name of the juror that Shabazz allegedly knew, but was unsuccessful. Federal agents then moved in and arrested Shabazz.

On the following morning, Friday, April 17, 1998, the district judge met with the attorneys involved in the case to discuss the jury-tampering attempt. Time was of the essence because closing arguments were scheduled to be made that very day. Assistant United States Attorney Keith Corbett informed the district court and the defense attorneys as follows:

> Yesterday[,] with Mr. Morgan and his client's [Corrado's] cooperation, we arrested an individual who contacted Mr. Morgan's client and advised that he knew one of the male jurors on this jury, that for an undisclosed amount of money, he could guarantee a hung jury, that he would, that his friend was confident that he could carry two or three of the jurors with him, that they'd had some preliminary discussions during the course of the trial about the case and he had expressed his opinions, they had expressed their opinions, and he felt comfortable that he could, as I said, secure two or three people's assistance in pushing his particular agenda.

A discussion then ensued concerning the problem and various methods that could be employed to address it. Corbett commented that "it may turn out that Monday at some point in time I think the court may have to bring the 12 people that constitute the final jury in one by one and perhaps begin some sort of independent examination of them . . . ." Later in

the conference, Morgan asked: "Judge, you haven't foreclosed . . . some kind of inquiry individually or voir dire . . . of the jury?" The district court responded: "Oh, no." However, the court then added:

> At the same time, not suggesting that anybody's rights to look into what has gone on, if anything untoward has gone on, as is given up [sic], and that to me means that until the jury has deliberated, if, if we can get them that far and they come to verdicts, the people deliberating shouldn't know that there's a problem. It seems to me that they should know as little as possible and should have curative instructions if they know anything.

The district court ultimately decided to postpone instructing the jury until the following Monday morning, in the hope that more information would emerge over the weekend about the truth of Shabazz's claims.

On Monday morning, April 20, 1998, the district court and the attorneys reconvened. Shabazz had refused to cooperate with investigators, so little new information was available. The district court stated as follows: "I started out from the position that we got to talk to everybody and I've fallen back from that and I'm pretty much moving in the direction of minimalism is better. . . . And I want to say as little as possible to disturb their state of mind and get them out there doing their, doing their work . . . ."

The district court therefore proposed that it would ask the jury three questions in open court and give them a fifteen-minute recess to reflect on those questions. Those questions were: "[H]as anyone outside the jury tried to influence you in any way about this case. Has anyone on the jury tried to influence what you will do in any, in your deliberations in any way and[,] is there any reason you believe that you could not continue to serve as a fair and impartial juror on this case." If the answer to any of those questions was "yes," an individual juror would be instructed to send the judge a note.

including the leadership role of the defendants, the finding of a conspiracy to murder Bowman, and the determination that Corrado was armed at the time that the defendants extorted money from Sophiea. The district court did not set out findings as to any of these issues at sentencing. Instead, it either summarily adopted the findings of the presentence report or simply declared that the enhancement in question was supported by a preponderance of the evidence. The following excerpt is representative:

> The Court finds that the enhancement for role in the offense set out in Paragraphs 89 and 101 of the presentence investigation report as to the extortions from Ramzi Yaldoo and George Yatooma are supported by a preponderance of the evidence. The Court finds that the enhancement of five points in connection with the extortion from George Sophiea . . . for possessing a firearm at the time of extortion is supported by a preponderance of the evidence; as is the calculation of the base offense level of 28 . . . in connection with the conspiracy to murder Harry Bowman.

In *Tackett*, the defendants similarly objected to their sentences on the ground that the district court made no findings as to contested issues of fact. After listening to counsels' arguments regarding an enhancement for obstruction of justice, the district judge "state[d] simply that '[t]he court adopts the factual findings and guideline applications in the presentence report.'" *Tackett*, 113 F.3d at 614 (second alteration in original). This court concluded that "[t]his is a far cry from the making of a finding for each matter controverted, as the plain language of Rule 32 requires," and remanded for resentencing. *Id.*; *see also United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997) ("The law in this circuit clearly prohibits a court faced with a dispute over sentencing factors from adopting the factual findings of the presentence report without making factual determinations of its own."); *United States v. Mandell*, 905 F.2d 970, 974 (6th Cir. 1990) (holding that a district court's

Corrado independently argues that the district court erred in not granting him additional downward departures, alleging that the government denied him a realistic opportunity to accept responsibility and that the criminal conduct of several of his extortion victims provoked his behavior. Finally, Tocco raises a general challenge to the district court's failure to set out findings of fact as to disputed sentencing matters.

In reviewing a district court's sentencing determinations, we will not reverse the district court's findings of fact unless they are clearly erroneous, *see United States v. Charles*, 138 F.3d 257, 267 (6th Cir. 1998), but will review its application of a guideline to a particular set of facts de novo. *See United States v. Wells*, 211 F.3d 988, 1003 (6th Cir. 2000).

1. *The absence of factual findings as to controverted matters*

The Federal Rules of Criminal Procedure provide that, for each sentencing matter controverted,

the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing. A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.

Fed. R. Crim. P. 32(c)(1). This court has required "literal compliance" with this provision, stating that it "helps to ensure that defendants are sentenced on the basis of accurate information and provides a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." *United States v. Tackett*, 113 F.3d 603, 613-14 (6th Cir. 1997).

In the present case, the district court did not comply with the requirements of Rule 32(c)(1). Both Corrado and Tocco objected to several findings in the presentence report,

Any juror who responded affirmatively would then be called in individually to answer questions from the district court and the attorneys. In the event that no juror sent back a note, the matter would then be considered resolved and the district court would proceed to instruct the jury and allow them to begin their deliberations.

Morgan, the attorney for Corrado, objected to this proposal, arguing that "there is a cloud hanging, of some sort, hanging over the jury now which may have or cause some unknown juror or jurors ultimately in deliberations to maybe bend over backwards the other way so that, you know, [']I'll never be the subject of any scrutiny now or any time in the future['] and they may not do what they're really supposed to do in there." He then intimated that he would be moving for a mistrial on behalf of Corrado. William Bufalino, Tocco's attorney, joined in Morgan's proposed motion as well. The district court responded, "Well, based on the information we have now, I'm not going to grant a motion for mistrial."

Court was then reconvened. The district court presented the three questions to the jury and granted a fifteen-minute recess. No juror submitted a note to the district court. The court then recalled the jury and gave them their instructions for deliberation. On April 29, 1998, the jury returned its verdicts, convicting Corrado and Tocco on all counts.

On May 13, 1998, Corrado moved for a new trial, arguing that Shabazz's attempted tampering denied him his right to an impartial jury. Corrado also argued that the jury may have been tainted by exposure to two front-page articles about the Shabazz incident that appeared in local Detroit newspapers on the weekend before the jury began its deliberations. The articles reported that Corrado had been arrested along with Shabazz after their meeting on the evening of April 16, 1998. (In actuality, Corrado was "arrested" in order to conceal his role in the sting operation, and was promptly released.) In his motion, Corrado contended that "[a] less than careful reading" of the articles "could result in the inaccurate, entirely

prejudicial impression that Paul Corrado acted in some fashion which was improper."

Corrado also moved for an order directing the government to disclose "any and all direct or circumstantial information linking [Shabazz] to a juror or any other subsequently generated information tending to show any improper private communication, or contact amongst jurors or with third parties as well as any information showing any form of extraneous influence, prejudicial impact or other circumstance which placed any juror in a compromising situation." Tocco joined in Corrado's motions for disclosure and for a new trial. The district court denied their motions.

On November 18, 1998, Shabazz pled guilty to obstruction of justice. He admitted to having offered one of the jurors in the Corrado trial $25,000 in exchange for that juror's vote of not guilty.

### 2.   Analysis

On appeal, Corrado and Tocco argue that their Sixth Amendment right to an impartial jury was violated by possible jury misconduct. Specifically, they contend that the district court did not adequately investigate whether any of the sitting jurors was improperly influenced by either the juror whom Shabazz approached or by the newspaper articles that reported Corrado's "arrest."

A district court's ruling as to an alleged act of jury misconduct will not be disturbed unless it constitutes an abuse of discretion. *See United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999). We recognize the difficulty of the district court's position, confronted with allegations of impropriety just before the jury was to begin its deliberations. Nonetheless, the district court's "minimalist" approach was an inadequate response to the serious and credible allegations of extraneous influences on the jury in this case.

techniques." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (citation and internal quotation marks omitted).

In this case, the affidavits tendered by the government in support of its Title III applications typically run seventy to one hundred pages and include a detailed description of the evidence that had already been obtained as well as a separate section detailing the aims of and need for continued electronic surveillance. The justifications listed by the government included the facts that the organization under investigation was believed to be an organized crime family that was substantially insulated against infiltration, that additional victims/witnesses would be unlikely to speak to the government out of fear of reprisal, and that attempts to interview these witnesses might compromise the government's investigation. On these facts, we do not believe that the issuing magistrate judges abused their discretion in granting the government's extension applications. *See United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir. 1988) (holding that a Title III warrant was justified where the government's evidence indicated that the defendants belonged to an organized crime family, that attempts to infiltrate the organization had failed in the past and were unlikely to succeed in the future, and that all of the government's informants had refused to testify because of fear of reprisal).

### F.   Sentencing issues

The defendants raise several challenges to specific aspects of their respective sentences. Both Corrado and Tocco object to the base offense level of 28 for their RICO convictions based on an alleged conspiracy to murder Harry Bowman. They object to their respective five-level enhancements pursuant to U.S.S.G. § 2B3.2(b)(3)(A)(iii) for displaying or possessing a gun in connection with the extortion of George Sophiea. The two defendants also object to the two-level enhancements for the leadership roles that they allegedly played in carrying out their extortion crimes.

## E.    Suppression of electronic surveillance recordings

Both Corrado and Tocco argue on appeal that certain wiretapping recordings admitted at trial should have been suppressed because the government's applications for these wiretappings did not establish that electronic surveillance was warranted.  Title III of the Omnibus Crime Control and Safe Streets Act of 1968 requires that applications for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

The defendants do not challenge the first electronic surveillance order procured by the government on December 17, 1991, or the extensions of that order granted in January and February of 1992.  They object, however, to the validity of the order obtained on March 17, 1992 (a de facto extension of the December 17 order), and five extensions of the March 17 order, arguing that the affidavits submitted in support of the surveillance extensions reveal that "agents had already gathered an exceedingly large quantum of evidence."  With that evidence, and the other available investigative techniques at the government's disposal, Corrado and Tocco contend that further electronic surveillance was unwarranted.

In reviewing the validity of an electronic surveillance order, we will accord "great deference" to the determinations of the issuing judge.  *See United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988).  "Thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant."  *Id.* This court has clarified that the purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional

By the morning of April 17, 1998, the district court was aware that a person had approached Corrado, claiming to have spoken with a juror in Corrado's trial.  This intermediary maintained  that the juror he had contacted was "confident that he could carry two or three of the jurors with him, that they'd had some preliminary discussions during the course of the trial about the case and he had expressed his opinions, they had expressed their opinions, and he felt comfortable that he could . . . secure two or three people's assistance in pushing his particular agenda."  Although the district court understandably had doubts about the veracity of Shabazz's claims, the fact that an individual had physically approached Corrado with this detailed information and that the individual then scheduled a second meeting with Corrado to arrange for payment lent credence to the allegations.  These circumstances are far more serious than a case of an anonymous phone call alleging vague improprieties on the part of the jury.  Indeed, by the morning of April 17, 1998, the government believed that Shabazz's claims were sufficiently credible to warrant arresting and charging him with attempting to influence a juror in violation of 18 U.S.C. § 1503.

This court has expressly held that, "[w]hen there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated." *United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995); *see also United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998) (requiring a hearing "[w]here a colorable claim of extraneous influence has been raised"); *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985) ("A trial court's refusal to permit an evidentiary hearing may constitute abuse of discretion when the alleged jury misconduct involves extrinsic influences.").  We conclude that Shabazz's claims provided credible evidence of jury-tampering and therefore required further investigation.

Moreover, the newspaper articles reporting Shabazz's jury-tampering attempt and arrest may have also improperly influenced the jury. The jurors in this case were not sequestered, and might easily have seen or heard about the two front-page articles, notwithstanding the district court's instructions not to read or view media reports about the trial. As Corrado points out, a less than careful reading of the articles—which reported that Corrado had been arrested along with Shabazz—could have fostered the mistaken impression that Corrado had devised the jury-tampering attempt. This type of extraneous influence also warrants investigation. *See United States v. Rugiero*, 20 F.3d 1387, 1390-91 (6th Cir. 1994) (approving a district court's decision to hold a hearing to investigate the impact on the jury of a television report that tied the defendant's trial counsel to organized-crime figures).

The nature and scope of the investigation required when jury misconduct is credibly alleged was set forth by the Supreme Court in *Remmer v. United States*, 347 U.S. 227 (1954). In *Remmer*, much like the present case, a juror was offered money in exchange for bringing in a favorable verdict. The Supreme Court decided that a hearing was required to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 230. Although the Court stated that any extraneous contact with a juror was "presumptively prejudicial," and that the burden rested on the government to demonstrate that the contact was harmless, *see id*. at 229, this court has understood the subsequent case of *Smith v. Phillips*, 455 U.S. 209 (1982), to alter that holding such that the defendant now bears the burden of proving juror bias. *See United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir. 1988).

The investigation by the district court in this case fell far short of the procedures set forth in *Remmer*. Instead, the district court directed three broadly-worded questions to the jury as a group and instructed any jurors who had affirmative responses to bring themselves to the court's attention by

therefore, even if their grand jury testimony indicated no illegal behavior on Corrado's part, it was not exculpatory as to the extortion charges that were in the indictment. We agree. *See United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994) (holding that material favorable to the accused must be either "evidence which serves to impeach a government witness' credibility" or "evidence which is *directly exculpatory of the defendant*" (emphasis added)).

Moreover, Corrado has made no showing that he would have been unable to identify, locate, and interview these individuals through reasonable efforts on his own part. Indeed, it was the defendants' own recorded conversations that brought these alleged bookmakers and gamblers to the government's attention in the first place. *See id*. at 1371 (stating that evidence need not be disclosed under *Brady* where it would be available to a defendant from another source); *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) (holding that the government was not obligated to turn over the names of three men who had had previous sexual relations with a rape and murder victim where "the police themselves learned of these men either from sources with whom [the defendant]'s attorney spoke or from persons readily accessible to [the defendant]").

Corrado may be correct in stating that "disclosure of the material would have been more than helpful to the defense in making determinations about possibly calling some of these persons as witnesses." Nonetheless, providing this type of help is not the purpose of the *Brady* rule. *See United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) ("The Supreme Court has made clear that the *Brady* rule is not an evidentiary rule which grants broad discovery powers to a defendant . . . ."). We therefore affirm the district court's denial of Corrado's *Brady* motion.

actual interference with attorney-client relationships." This finding is not clearly erroneous. The government's mistake falls far short of an unconstitutional interference with Corrado's right to the effective assistance of counsel. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) (holding that a defendant must demonstrate that the government's intrusion upon his relationship with his attorney created a possibility of either injury to his defense or benefit to the government in order to establish a violation of the right to counsel).

### D.   Brady material

Corrado next argues that the district court erred in denying his motion for disclosure of exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). A district court's denial of a *Brady* claim is reviewed by this court de novo to determine whether the suppressed evidence undermines confidence in the outcome of the defendant's trial. *See United States v. Miller*, 161 F.3d 977, 987 (6th Cir. 1998). A defendant is entitled to a new trial if the defendant shows that the suppressed exculpatory evidence was not discovered by the defendant until after trial, could not have been discovered earlier with due diligence, and is material. *See United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).

In particular, Corrado argues that the government had a duty to turn over the transcripts of the grand jury testimony of several alleged bookmakers and gamblers whose names were mentioned in recorded conversations involving the defendants. Corrado surmises that the government found and subpoenaed these alleged bookmakers and gamblers, and that their testimony before the grand jury was favorable to the defendants. None of these alleged bookmakers were called to testify at trial.

The district court denied Corrado's motion for disclosure on the ground that Corrado was not charged in the indictment with extorting any of these alleged bookmakers and,

writing a note. A juror who had even the slightest hesitation about coming forward could simply do nothing. Indeed, in retrospect, it is now clear that the juror who had in fact been contacted did just that. We therefore conclude that the district court abused its discretion by failing to conduct an adequate evidentiary hearing into the allegations of extraneous influences on the jury pursuant to the holding in *Remmer*.

It is true that the defendants did not expressly request a *Remmer* hearing below. The district court, however, was fully aware of the nature of Shabazz's claims, and Corrado and Tocco plainly stated their objections to the district court's three-question proposal in their motions for a mistrial and for a new trial. Given these circumstances and the serious nature of the claims of jury misconduct, it was the district court's duty to order a hearing sua sponte. *See United States v. Davis*, 177 F.3d 552, 556-57 (6th Cir. 1999) (holding that the emergence of a credible claim of extraneous influence on a jury imposed a duty on the district court to conduct a *Remmer* hearing despite the fact that the defendants had not expressly requested such a hearing below); *Rigsby*, 45 F.3d at 124-25 ("When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated."). We impose this responsibility on the district court with some reluctance, but this is the unusual case requiring such action.

The information that has emerged since the defendants were sentenced has only confirmed the need for further investigation into possible jury misconduct in this case. Shabazz pled guilty to obstruction of justice and admitted to offering a juror $25,000 in exchange for a vote of not guilty. Edward Kennedy, the approached juror, testified at Shabazz's grand jury proceedings. Kennedy admitted that he had spoken with Shabazz twice about the trial, once briefly in February of 1998 and a second time on April 14 or 15, 1998, just prior to the closing arguments in the case. During their second meeting, Shabazz asked Kennedy, "you think you could get

[the jury] to vote not guilty" and offered Kennedy $25,000 to influence the jury to reach a favorable verdict for Corrado. Kennedy testified that, "[s]o like I just said, yeah, you know, whatever." Although Kennedy maintained that he "didn't want to be a part of this," it is clear at the very least that Shabazz spoke with Kennedy about this case on two occasions, that Shabazz offered him money in exchange for a verdict favorable to the defense, and that Kennedy did not expressly reject Shabazz's offer.

In response to the defendants' claims of jury misconduct, the government points out that Kennedy turned out to be an alternate juror and therefore did not take part in the jury's deliberations. Although this is true, it is also true that Kennedy admitted to having discussed the nature and quality of the evidence against the defendants with the other jurors and that he was able to interact freely with all of the jurors until April 20, when the deliberating jurors were charged and separated from the alternate jurors. Without a hearing, there is simply no way to gauge whether or to what extent Kennedy wrongfully attempted to influence the jurors that did deliberate.

The government further argues that, even if Kennedy did speak with the sitting jurors, the defendants could not possibly have been prejudiced by an attempt to sway the jury *in their favor*. However, if the sitting jurors suspected that Kennedy was attempting to improperly influence them to acquit and, particularly, if they read or heard about the articles that reported Corrado's "arrest," they might well have reached the incorrect conclusion that the defendants were attempting to tamper with the jury. Such conclusion, if any were made, would undoubtedly have been prejudicial to the defendants. In any event, the gravity and credibility of the jury-tampering charges in this case requires that the extent of any extraneous influence be properly investigated.

We therefore vacate Corrado's and Tocco's convictions and sentences and remand for a *Remmer* hearing. At this hearing,

the defendants should be accorded the opportunity to question the jurors individually and under oath about the extent of their interaction, if any, with Kennedy. *See Davis*, 177 F.3d at 557. The defendants should also be permitted to investigate the impact, if any, of the news reports describing Shabazz's arrest that were issued on the weekend before the jury began its deliberations.

### 3. *Disclosure of sealed materials*

Corrado and Tocco also appeal the district court's denial of their motion to unseal Kennedy's grand jury testimony and the report of his interview with the FBI. Ordinarily, a district court's determinations as to such disclosure are entitled to great deference. *See, e.g.*, *United States v. John Doe, Inc. I*, 481 U.S. 102, 116 (1987) ("[W]e have repeatedly stressed that wide discretion must be afforded to district court judges in evaluating whether disclosure is appropriate."). However, in light of the facts that some of these materials will be relevant to the *Remmer* inquiry and that Shabazz's criminal proceedings have since ended, we believe that the district court should revisit the defendants' request for disclosure. In making this determination, the district court may find useful the analysis in *United States v. Moten*, 582 F.2d 654 (2d Cir. 1978), in which the Second Circuit reviewed a defendant's disclosure requests in a similar context. *See id*. at 661-64.

## C. Prosecutorial misconduct

The only allegation of prosecutorial misconduct raised by Corrado that was not addressed by this court in *United States v. Jack William Tocco* concerns a September 24, 1998 plea-negotiation letter sent by the government to Corrado. That letter was addressed to Paul Corrado in care of his attorney's law office, where it was delivered. Corrado argues that by addressing the letter directly to him, the government interfered with his right to the assistance of counsel.

The district court considered Corrado's allegations and found, as a factual matter, that "there was no intended or