**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0406n.06

No. 11-6493

**FILED**
*Apr 25, 2013*
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| LEVAR WILLIAMS, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  MERRITT, SUHRHEINRICH and DONALD, Circuit Judges.**

**SUHRHEINRICH, Circuit Judge.**  Defendant Levar Williams was convicted by a jury of conspiracy to distribute at least fifty grams of crack cocaine and possessing with intent to distribute crack cocaine, and sentenced to 360 months' imprisonment.  He challenges both his conviction and sentence.  We **AFFIRM.**

**I.  Background**

On December 31, 2008, Cleveland, Tennessee Police Officer Tyler Pride initiated a traffic stop of a car with a nonfunctioning rear left brake light.  Defendant was the driver.  He identified himself to Pride as Solomon Williams.  Pride thought Defendant seemed unusually nervous and asked him to get out of the car.  Defendant attempted to flee but stopped after being tased. Defendant had a bottle containing 3.9 grams of crack.

-1-

In early 2009, Cleveland Narcotics Detective Dean Beverly received a letter from Anna Smith concerning drug dealers. Beverly contacted Smith, who agreed to become an informant and to make controlled purchases of crack. Smith told Beverly that she had been addicted to crack cocaine and was familiar with individuals who were selling the drug.

Smith bought drugs from Defendant on a number of occasions. Officers had a procedure for controlled drug transactions. The informant would call the target to set up the drug deal. Officers recorded the calls. Officers would search the informant and his or her vehicle prior to the transaction, equip the informant with an audio recording device and a separate audio transmitting device (for real-time monitoring), and give the informant cash for the transaction. Officers would follow the informant to the meeting and monitor the transaction. Afterwards, the officers would meet with the informant, retrieve the narcotics, search the informant again, debrief and pay the individual. The drugs would then be taken to the evidence room at the Cleveland Police Department for processing. Audio or video recordings from the eleven transactions between Smith and Defendant were admitted into evidence at trial without objection.[1]

On December 23, 2009, officers applied for and obtained a wiretap order. DEA Agent Frank Ledford prepared the supporting affidavit. Ledford discussed the source of his information:

> This affidavit is based primarily on my review of materials provided by agents and officers as well as discussions with CPD officers and Sammy McNelley, who has been a Task Force Officer with the DEA in Chattanooga, Tennessee.[] I have also personally participated in some phases of the investigation, although I was not personally present for the majority of drug purchases and other activity discussed herein. I rely extensively on analysis of reports written by other federal, state, and local law enforcement officers and employees assigned to this case; the review of telephone toll records and pen register data; review of text messages received from

---

[1]The recordings themselves were admitted into evidence and the transcripts were admitted for identification purposes.

the execution of a federal search warrant for such content; and review of debriefings of controlled sources of information and other cooperating witnesses.

In a footnote Ledford explained that one source was Sammy McNelly[2], a former agent with the 10th Judicial Drug Task Force, who had been terminated from his employment for causing "dissension" and improper cell phone use. The footnote explains that:

> Sammy McNelley had originally prepared an affidavit for the interception of wire and electronic communications in this case. He was recently terminated from his employment with the 10th Judicial Drug Task Force, which disqualified him from further participation as a DEA Task Force Officer. My understanding is that he was terminated for causing "dissension" within the 10th Judicial Drug Task Force and for improper use of a Task Force-issued cell phone. I do not have reason to believe that McNelley has been dishonest or committed a crime. At this writing, McNelley is appealing the decision to terminate his employment. McNelley was the DEA "case agent" for the investigation discussed herein and I have relied extensively on information provided by him for this affidavit. In my opinion, the integrity of all aspects of the investigation, including the matters discussed in this affidavit, is sound.

Ledford further explained that a wiretap order was needed to help identify "the entire organization operating in Cleveland and Chattanooga, Tennessee, and elsewhere;" stash houses, sources of supply, and the specifics of the transportation of controlled substances; and "co-conspirators involved in the distribution of controlled substances." Ledford detailed why other alternative investigative techniques were ineffective. For example, Ledford stated that while "Physical Surveillance" "had been proven useful in verifying several meetings and corroborating CI information," it was "of limited value" because "[m]uch of the activity continues to take place in neighborhoods, apartment buildings populated by friends and other individuals who WILLIAMS knows and who could alert WILLIAMS of the presence of surveillance units if detected." Ledford

---

[2]The affidavit spells the surname "McNelley."

stated that "Use of Grand Jury Subpoenas" would not be helpful because Defendant and others "would resort to violence and intimidation against persons they know to be cooperating." Similarly, "Interviews of Subjects and Associates" "would produce insufficient information" because these individuals "would be under no obligation to speak with authorities," and might divert the investigation with untruths. Such interviews could also alert the members of the investigation. "Search warrants" had been used, but given the size and scope of the suspected conspiracy, several locations were likely and the wiretap was necessary to help identify these other locations. Ledford explained that one "Undercover Officer[]" had been used to purchase drugs from Defendant, but she had not been able to attain a level of authority in the organization and so was not able to identify all the members or sources of the drugs. "Cooperating Individuals" had been used and had provided useful information, "but not in depth to the point where the entire scope of the organization could be revealed to law enforcement." Ledford also discussed the limited utility of controlled purchases, telephone records, pole cameras, and trash pulls.

Some of the recorded calls were between Defendant and codefendant Demetrius Byrd, one of Defendant's primary sources of cocaine. Byrd also later cooperated with the government. On January 22, 2010, per the wiretap conversation, Byrd planned to travel from Chattanooga to Cleveland to deliver crack to Defendant. He was stopped twice by police on the way, and the second time the officers found approximately five grams of crack on Byrd. As a result, the officers obtained a search warrant for Defendant's residence. They also got an arrest warrant for Defendant, and arrested him at codefendant Adrius Hickey's house. At Hickey's house, officers found Defendant in Hickey's restroom with 2.5 grams of cocaine base.

On March 9, 2010, a federal grand jury indicted Defendant and others for conspiring to distribute at least fifty grams of crack cocaine between December 2008 and January 2010, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A) (Count One). Defendant was also charged with possessing with intent to distribute crack cocaine on December 31, 2008 (Count Two), and thirteen distributions of crack cocaine between June 24, 2009, and January 26, 2010, all in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Counts Three through Fifteen).

Initially, Defendant agreed to plead guilty to a lesser-included offense of Count One (i.e. a drug-trafficking conspiracy with a lesser quantity), and the Government agreed to dismiss the remaining counts. On July 15, 2010, Defendant pleaded guilty pursuant to this written agreement. However, at the initial sentencing hearing on November 18, 2010, during allocution, Defendant informed the court that "truthfully I am not this big time drug dealer," that "I was used as a scapegoat to save Cleveland city police department," because he had previously accused officers of assaulting him.[3] As a result, the district court rejected Defendant's guilty plea and set the case for trial.

Defendant filed a motion to suppress evidence obtained pursuant to the court-authorized wiretap, arguing that the affidavit filed in support of the wiretap application failed to meet the necessity requirements of 18 U.S.C. § 2518. Defendant also alleged that the wiretap affidavit improperly relied on information from McNelly, who lacked credibility because he had been fired. The magistrate judge found that the Government had established necessity and that the affidavit contained sufficient and reliable evidence to authorize the wiretap, and therefore recommended that information obtained from the wiretap not be suppressed. The district court agreed and denied the motion. The court also found that the affiant's reliance on information provided by the officer who

---

[3]Defendant read a letter he had prepared to show the court his "true character."

had been fired did not undermine the reliability of the affidavit, because the former officer's credibility had not been called into question by his termination.

After a three-day jury trial, Defendant was convicted of Counts One through Fourteen and acquitted of Count Fifteen. The Government's proof included testimony from sixteen witnesses, including three co-conspirators and two individuals who had purchased drugs directly from Defendant; seventy-three audio recordings of Defendant arranging or engaging in drug distributions, four video recordings of Defendant distributing drugs, and thirteen baggies of crack cocaine purchased during controlled buys or recovered from Defendant when he was arrested.

Smith testified at trial that she purchased crack cocaine from Defendant eleven times, and that she was subject to a protocol for each transaction. TBI Agent Kim Harmon, working undercover and accompanied by a confidential informant, purchased crack cocaine from Defendant during a recorded transaction. Codefendant Adrius Hickey testified that he sold food stamps in exchange for crack cocaine. In one audio recording, Defendant refused to accept food stamps for the crack cocaine, but said he would accept them for hydrocodone. Hickey testified that he introduced Smith to Defendant. Demetrius Byrd explained the terminology he and Defendant used in conversations caught in the wire intercepts to set up drug transactions and testified that he and Defendant met numerous times to conduct drug transactions. Byrd testified that he was stopped two times by police on January 22, 2010, while he was traveling from Chattanooga to Cleveland to deliver crack cocaine to Defendant. Detective Beverly testified that after this incident, officers obtained a search warrant for Defendant's residence and also an arrest warrant for Defendant. They found him at Hickey's house, in the restroom with 2.5 grams of cocaine base. Elli Roberson, another cooperating witness, testified that he sold crack to Defendant five or six times in 2008 to early 2009. And chemical

analysts from TBI testified that they conducted a number of different tests on the substances derived from the investigation, all without objection from Defendant.

Defendant objected to his presentence report because he did not receive a two-level reduction for acceptance of responsibility. At sentencing, the district court denied the objection, stating:

> [F]rom the defendant's remarks [at his original sentencing hearing] the defendant impressed the Court as someone who was minimizing their involvement and was suggesting that he had been framed by other people involving things for reasons that he articulated.
> The commentary says that this adjustment should be provided to a defendant who demonstrates that they have truthfully admitted the conduct comprising the offense and truthfully admitted or not falsely denied additional relevant conduct for which the defendant is accountable. Based upon the defendant's actions before this Court during his sentencing, the Court concludes that he has not accepted responsibility for his actions and the defendant's conduct from that time until today does not clearly demonstrate acceptance of responsibility.

The court sentenced Defendant to an aggregate sentence of 360 months' imprisonment, within and at the bottom of the Guidelines range applicable to him as a career offender, based on two prior felony drug convictions.

Defendant appeals. First, he challenges the court's denial of his motion to suppress the evidence obtained pursuant to the court-authorized wiretap. He also claims that the evidence was not sufficient to support his convictions. Lastly, he objects to the court's failure to grant him a reduction for acceptance of responsibility.

## II. Analysis

### A. Wiretap

The wiretap statute, 18 U.S.C. § 2518(1)(c), provides that "[e]ach application for an order authorizing or approving the interception of a wire . . . communication" must include "a full and

complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

Defendant challenges the wiretap order on two grounds. First, he argues that the Government failed to prove necessity. Second, he claims that the affidavit in support of the intercept order was based on insufficient or unreliable evidence and that the order should not have issued.

The "necessity" requirement is designed "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime" and to prevent wiretapping from being "routinely employed as the initial step in criminal investigation." *United States v. Landmesser*, 553 F.2d 17, 19–20 (6th Cir.1977) (quoted cases omitted). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Alfano*, 838 F.2d 158, 163-64 (6th Cir.1988) (internal quotation marks and citation omitted ). *See also United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000). This court has explained that "the purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *Id*. (quoting *Landmesser*, 553 F.2d at 20).

We review the district court's ruling on a motion to suppress a wiretap for clear error as to the factual findings and de novo as to the questions of law. *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002). The "issuing judge's" determination is entitled to "great deference." *Corrado*, 227 F.3d at 539.

### 1. Necessity

Defendant claims that law enforcement officials failed to establish necessity for the wiretap because they already had overwhelming proof against him and his coconspirators. We disagree, for the reasons articulated by the district court:

> Here, the 63-page affidavit plainly and plausibly described proper investigatory ends which could not be reasonably furthered simply through the traditional investigatory techniques employed to date. . . . [T]he affidavit emphasized that a wiretap was the only mechanism with a reasonable likelihood of identifying Defendant's *entire drug trafficking organization.* While controlled purchases had implicated Defendant as a distributor, and traditional surveillance had identified several possible supplies, the affidavit stated officers were unsure of many of the specifics of the trafficking network, such as where stash houses were located and precisely who supplied Defendant. The affidavit further revealed that officers did not aim simply at prosecuting Defendant, but at making prosecutable cases against Defendant, his co-conspirators, and his suppliers, some of whom the government had not been able to positively identify through traditional means. In short, while traditional techniques, such as the use of confidential informants, surveillance, and interviews with associates, were able to uncover much of the street-level criminal activity of the conspiracy, they were not able to peer into the higher-order operational interactions between Defendant and his co-conspirators and suppliers. Defendant's objection ignores this reality insofar as it stresses law enforcement officials could have arrested and prosecuted Defendant well before seeking the wiretap. [Footnote omitted]

As Defendant's argument implicitly acknowledges, the officers used several traditional investigative techniques and contemplated others before seeking the wiretap order. The affidavit carefully informed the issuing judge why non-wiretap techniques had been inadequate. *See Landmesser*, 553 F.3d at 20; *Corrado*, 227 F.3d at 528; *Alfano*, 838 F.2d at 163. *Cf. United States v. Rice*, 478 F.3d 704, 707-09 (6th Cir. 2007) (upholding the district court's grant of a motion to suppress a wiretap order because the affiant included a reckless, misleading statement about the general ineffectiveness of physical surveillance and offered no evidence that any other investigative technique was used or even seriously considered). *Cf. United States v. Wolcott*, 483 F. App'x 980, (6th Cir. 2012) (observing that while "[s]uspicions of a conspiracy that extends beyond a few

identifiable individuals will not always warrant the authorization of wiretap authority," the government had adequately shown necessity for wiretaps on the defendant's cellphones where the confidential informant was a buyer and codefendants did not offer information or leadership roles in the conspiracy).

In light of the "great deference" owed the issuing judge and the affidavit's detailed discussion of other investigative techniques, the district court did not err in finding that the necessity requirement was satisfied.

### 2. Reliance on McNelly

Defendant alleges that the affidavit in support of the wiretap order prepared by Ledford was insufficient or unreliable because Ledford relied on Agent McNelly. Defendant argues that Ledford's failure to properly investigate the reason for McNelly's firing was reckless, and that as a result Ledford's affidavit lacked probable cause.

This argument must be rejected. First, Ledford did not make a false statement; he disclosed that some of the information he received came from an officer who had been fired. Second, Ledford pointed out that he received other independent information that established probable cause. As this court explained in *Alfano*, "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III." *Alfano*, 838 F.2d at 161. Although Title III "was enacted for the purpose of regularizing and controlling the issuance of warrants for wiretaps," there is no specific formula that must be met for a warrant." *Id.* Rather, the evidence must be judged on the totality of the circumstances, i.e., "whether there is probable cause to believe that evidence of a crime will be uncovered." *Id.* at 161-62.

Ledford's affidavit met this standard. As the Government points out, Defendant himself acknowledges the numerous controlled purchases and other investigative activity offered in support

of the Government's application for authorization to intercept wire and electronic communications over his telephone. The controlled purchases, along with surveillance conducted prior to the wiretap, and pen register data detailed in the affidavit, which were all independent of McNelly's information, provided probable cause. And Ledford stated that he referenced numerous sources of information, including his own participation in the investigation, his review of audio recordings of controlled buys, and review of debriefings of confidential informants and cooperating witnesses.

Defendant failed to present any information establishing that McNelly provided inaccurate information to Ledford.[4] As the district court held, to conclude that "McNelly's termination for cell phone abuse and general contentiousness meant it was unreasonable for SA Ledford to rely on McNelly to provide accurate information "would be an exercise of pure speculation." Thus, having failed to show any factual deficiencies with the affidavit, his argument regarding lack of necessity is rejected. *Cf. United States v. Rice*, 478 F.3d 704, 707-11 (6th Cir. 2007) (holding that the district court did not err in suppressing the fruits of the wiretap where it determined that certain statements about physical surveillance in the affidavit were misleading and recklessly made, and without them, the affidavit failed to meet the necessity requirement).

---

[4]In his brief, Defendant claims that had Ledford spoken with McNelly's superiors or personally reviewed his file, he would have learned of several deceitful practices by McNelly, and cites "Exhibit to Memorandum in Support of Motion To Suppress R. No. 331, PAGE ID # 943." Record Entry 331 is Defendant's memorandum in support of his motion to suppress. There is no exhibit attached to the memorandum. The memorandum states merely that "[w]hile the United States disclosed its understanding of Mr. McNelley's situation on December 23, 2009, subsequent investigation or events may have shown affiant's understanding to be mistaken . . . certainly, subsequent investigations might have revealed evidence of dishonesty and/or criminal behavior, including the falsification of evidence related to this case."

## B. Sufficiency of Evidence

Defendant argues that the Government did not prove beyond a reasonable doubt that he conspired to distribute 50 grams or more of crack cocaine and that he distributed crack cocaine twelve times, as found by the jury.

We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To establish a drug conspiracy, under § 846, the government must prove, beyond a reasonable doubt, "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (internal quotation marks and citation omitted). "To establish a violation of § 841(a)(1), the government must prove the following elements: "(1) knowing (2) possession of a controlled substance (3) with intent to distribute." *United States v. Mackey*, 265 F.3d 457, 460 (6th Cir. 2001) (internal quotations marks and citations omitted).

First, Defendant complains that Smith, who was the primary witness for most of the distribution counts, lacked credibility because she was a paid informant and admitted that she had been using crack herself while acting as a confidential informant. In addition, she was never properly searched before or after the controlled buys because no female officer was present to conduct a proper search. Defendant's criticisms are unavailing. To begin with, "it must be noted that 'attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir.1984)). And, "it is well-settled that on appeal, there 'is no place . . . for arguments regarding a government witness's lack of credibility.'"

*United States v. Talley*, 164 F.3d 989, 996 (6th Cir.1999) (quoting *Adamo*, 742 F.2d 927, 934–35 (6th Cir.1984)).

Defendant has a similar complaint about Byrd, who "interpreted" the meanings of recorded conversations between he and Defendant. Defendant claims Byrd had a motive to lie because he hoped to obtain a lower sentence. Yet, "[a]ppellate courts, unlike trial courts, do not have an opportunity to observe witness demeanor and therefore are even less qualified to judge witness credibility." *Adamo*, 742 F.2d at 935.

Nonetheless, independent evidence corroborated both Smith and Byrd's testimony. Wiretap intercepts corroborated Byrd's testimony regarding his drug transactions with Defendant. Byrd authenticated his intercepted conversations. These recordings and controlled purchases corroborated Smith's testimony. Detective Beverly also confirmed Smith's testimony. He repeatedly observed Smith set up drug transactions with Defendant, observed and listened to her engage in each transaction. Each time she did not have any crack cocaine prior to the meeting and she had crack cocaine after each meeting. Furthermore, coconspirator Roberson[5] testified that he sold drugs to Defendant five or six times, in five or six gram amounts, and that when he didn't have any drugs to sell, he would refer Defendant to Byrd and others. Coconspirator Hickey testified that Defendant sold him crack cocaine, which Hickey paid for with food stamps. Hickey introduced Smith to Defendant so that she could purchase cocaine from him.

The trial evidence included twelve controlled purchases of crack cocaine, all recorded; testimony from an undercover agent, three coconspirators, numerous wire intercepts and TBI lab reports confirming that the substance sold by Defendant was crack cocaine. Based on the

[5]Roberson is an unindicted coconspirator.

-13-

voluminous evidence in this case, a reasonable juror could easily have found that Defendant participated in a conspiracy to distribute drugs and that he distributed crack cocaine to Smith and Agent Harmon. Moreover, Defendant was able to cross-examine the witnesses and expose their motivations to the jury.

Defendant also complains that several of the TBI lab reports do not specify that the substance analyzed was "crack cocaine" or "cocaine base."[6] However, at trial TBI agent David Holloway explained that he was "certain" the contents were cocaine base and that the failure to make that distinction on his report was "strictly an oversight." As Defendant's own brief reflects, the TBI agents who testified confirmed that the seized substances were cocaine base. TBI Agent Carl Smith, stated that he performed different confirmatory tests to identify whether the substance was cocaine base. Sometimes he would conduct an additional test to confirm the substance was cocaine. Other times he was able to determine through physical examination that the substances were cocaine base. Defendant did not object to the admission of any of these reports.

Furthermore, three coconspirators testified that Defendant distributed crack cocaine. The recordings and intercepted conversations revealed that Defendant distributed crack cocaine. Defendant was caught with crack cocaine. So even if some of the lab reports did not specify the exact form of the cocaine distributed by Defendant, the jury had abundant evidence to find that Defendant trafficked in crack cocaine and was guilty of Counts One through Fourteen.

---

[6]TBI Analyst Carl Smith testified that, although some of the reports said "cocaine," rather than "cocaine base," this did not signify that the substance was not cocaine base, since Tennessee law did not differentiate between the two forms of the drug.

## C. Acceptance of Responsibility

Defendant argues that the district court erred in failing to grant him a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 because he attempted to plead guilty and never claimed that he was innocent. The district court's decision to deny an acceptance of responsibility reduction is entitled to "great deference" by this court. We review for clear error. *Unites States v. Genschow*, 645 F.3d 803, 813 (6th Cir. 2011). The defendant must "clearly demonstrate[] acceptance of responsibility." *United States v. Crousore*, 1 F.3d 382, 386 (6th Cir. 1993); *United States v. Roberts*, 243 F.3d 235, 241 (6th Cir. 2001).

Defendant was initially given the benefit of a plea bargain. When given the opportunity to address the court at his initial sentencing hearing, Defendant denied personal responsibility, stating "[s]urely by now we see and understand how everybody painted the picture on me. When I say 'everybody,' I mean the FBI, DEA, detectives, and street informants who was and are doing the same mess they arrested me for." Defendant claimed he was merely a petty hustler, a scapegoat, and never a "big time" dealer. This admission was clearly inconsistent with the charges in the indictment and the plea agreement. As the district court observed, the guideline requires the defendant to "truthfully admit[]the conduct comprising the offense of conviction." U.S.S.G. § 3E1.1 cmt.n.1. Although section 3E1.1 does not automatically preclude a reduction if the defendant goes to trial, Defendant has consistently downplayed his factual guilt. Thus, he is not entitled to a reduction. *Cf.* U.S.S.G. § 3E1.1 cmt. n.2 ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).")

He persists on appeal, claiming that he "did not deny his conduct alleged in the Indictment . . . or set forth in his plea agreement," and that he "was simply using his right of allocution to advise the Court of what he perceived to be unfairness in the methods used by, and motivation of, law enforcement in his case." In short, Defendant has yet to admit factual guilt. There is no clear error and the district court's determination is entitled to deference.

### III.  Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**