HELENE N. WHITE, Circuit Judge,
concurring in part and dissenting in part.
A death sentence is “unique [among criminal sentences] in its ... irrevocability,” Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), which makes it, of course, the “most severe punishment,” Roper v. Simmons, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). For this reason, the Eighth Amendment’s prohibition on “cruel and unusual punishments” and its protection of human dignity create a “heightened need for reliability in the determination that death is the appropriate punishment in a specific case.” Caldwell v. Mississippi, 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (internal quotation marks omitted).
Capital punishment “must be limited to those offenders who commit ‘a narrow category of the most serious crimes’ and whose extreme culpability makes them ‘the most deserving of execution,’ ” Roper, 543 U.S. at 568, 125 S.Ct. 1183 (quoting Atkins v. Virginia, 536 U.S. 304, 319, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)); see also Kennedy v. Louisiana, 554 U.S. 407, 435, 439, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (holding that human dignity presumes both respect for the individual and a necessity to constrain capital punishment’s use). Thus, a death sentence is invalid and unconstitutional if a defendant’s crimes “cannot be said to have reflected a consciousness materially more depraved than that of any person guilty of murder.” (Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (internal quotation marks omitted)); see also Atkins, 536 U.S. at 319, 122 S.Ct. 2242 (holding that “the culpability of the average murderer is insufficient to justify the most extreme sanction available”).
The “underlying principle that the death penalty is reserved for a narrow category of crimes and offenders” is implemented throughout the capital sentencing process. Roper, 543 U.S. at 568-69, 125 S.Ct. 1183. Sentencing rules thus limit the death penalty to murderers most deserving of execution (in cases of crimes against individual persons), and protect a criminal defendant’s rights, including his right to a fair trial. See Eddings v. Oklahoma, 455 U.S. 104, 110-12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The Federal Death Penalty Act (FDPA) accordingly requires this court to “review the entire record in the case,” and *380 directs us to examine the issues raised by the capital defendant, as well as consider “whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered.” 18 U.S.C. § 3595(c). A careful review of the record, measured against the Constitution’s guarantees and the FDPA’s directives, mandates that Taylor’s death sentence be vacated. Further, the Supreme Court’s decision in Johnson v. United States, - U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), compels the conclusion that 18 U.S.C. § 924(c)(3)(B) — which provides the definition of “crime of violence” underlying Taylor’s two § 924(j) convictions — is unconstitutionally vague, and that those convictions must be vacated. For these reasons, I respectfully dissent from Parts I, II, III, VIII, and XV of the majority opinion, join in Parts TV, V, IX, X, XI, XIII, and XIV, and concur separately in Part V.[1]
Ground I
The Sixth Amendment guarantees to criminal defendants the right to a fair trial by an impartial jury. U.S. Const. amend. VI; Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Under Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), if a district court learns that a juror has been exposed to an unauthorized communication that may affect the juror’s partiality and thereby prejudice the defendant, the court must “determine the circumstances [of the unauthorized communication], the impact [of the communication] on the juror, and whether or not [the communication] was prejudicial, in a hearing with all interested parties permitted to participate.” Id. at 229-30, 74 S.Ct. 450 (emphasis added); cf. Maj. Op. 347-48 (omitting italicized language). Remmer thus imposes on a district court two distinct obligations: a duty to investigate allegations of a juror’s exposure to an unauthorized communication and a duty to determine whether the exposure violated the defendant’s constitutional rights. See United States v. Corrado, 227 F.3d 528, 535-36 (6th Cir.2000) (stating that “ ‘when there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated’” (quoting United States v. Rigsby, 45 F.3d 120, 124-25 (6th Cir.1995))); United States v. Shackelford, 777 F.2d 1141, 1145 (6th Cir.1985) (holding that where “possible juror misconduct is brought to the trial judge’s attention he [or she] has a duty to investigate and to determine whether there may have been a violation of the [S]ixth [A]mendment”); see also Williams v. Bagley, 380 F.3d 932, 945 (6th Cir.2004) (observing that “[c]learly established Supreme Court precedent dictates that when a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury” (internal quotation marks omitted)). “Where a col-orable claim of extraneous influence has been raised, ... a Remmer hearing is necessary to provide the defendant with the opportunity to prove actual bias.” United States v. Herndon, 156 F.3d 629, 635 (6th Cir.1998) (emphasis added) (inter *381 nal quotation marks omitted); id. at 637 (reiterating that “the district court has a duty to investigate [a claim of alleged juror influence], and if the allegation is of an extraneous influence, then the district court should have conducted a Remmer hearing”); United States v. Davis, 177 F.3d 552, 557 (6th Cir.1999); see also Smith v. Phillips, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (observing that “the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias” and discussing Remmer); United States v. Zelinka, 862 F.2d 92, 95-96 (6th Cir.1988) (holding that “when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held”); Rigsby, 45 F.3d at 123 (stating that “we require a Remmer hearing in all cases involving an unauthorized communication with a juror or the jury from an outside source that presents a likelihood of affecting the verdict”); United States v. Pennell, 737 F.2d 521, 532 (6th Cir.1984) (observing that “Remmer ... controls the question of how the district court should proceed where ... allegations [of potential jury partiality] are made, i.e., a hearing must be held during which the defendant is entitled to be heard”).
Here, after individually interviewing each juror and alternate juror, the district court learned that most had indeed heard the reported “racist redneck” comment. The court thus should have provided Taylor a meaningful opportunity to prove actual bias. Because the court denied Taylor’s request for a Remmer hearing, it abused its discretion.[2] See Herndon, 156 F.3d at 637 (holding that although “this court affords broad discretion to the district court in determining the type of investigation necessary to determine juror bias, the district court must provide the defendant a meaningful opportunity to prove the same”); see also Turner v. Murray, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (plurality opinion) (“By refusing to question prospective jurors on racial prejudice, the trial judge failed to adequately protect petitioner’s constitutional right to an impartial jury.”).
The majority cites United States v. Mack, 729 F.3d 594, 606 (6th Cir.2013), to support its position that district courts are given discretion — as an alternative to a bright-line rule — because “requiring district courts to explicitly inquire whether a juror was prejudiced ... might actually exacerbate juror bias by ‘unnecessarily highlighting] the [communication] in the eyes of the jurors.’ ” Maj. Op. 348 (quoting Mack, 729 F.3d at 606). Contrary to the majority’s understanding of Mack, we did not there expressly reject a bright-line rule or even approve the district court’s decision not “to make an issue of it” so as not to “unnecessarily highlight the matter in the eyes of the jurors.” Mack, 729 F.3d at 606. Rather, the court noted the defendant never requested a Remmer hearing and concluded there was no plain error, explaining:
A defendant is entitled to a Remmer hearing to establish actual bias of a juror “only when the alleged contact presents a likelihood of affecting the verdict.” United States v. Frost, 125 F.3d 346, 377 (6th Cir.1997). “[N]o presumption of prejudice arises merely from the fact that improper contact occurred.” United States v. Davis, 177 F.3d 552, 557 (6th Cir.1999). Here, the district court discharged its duty to investigate and decide whether there may have been a violation of the Sixth Amendment right to a fair and impartial jury. See id. “[A] defendant who waits until appeal *382 to request a hearing bears a heavy burden, since the defendant has thereby effectively deprived this court of any basis for concluding that a hearing would be necessary, and asks us to presume that the district court would not have acceded to such a request, and would have done so for erroneous reasons.” United States v. Walker, 160 F.3d 1078, 1083 (6th Cir.1998). Under the circumstances, no plain error exists that would justify reversal on this ground.

Id.

Unlike Mack, Taylor expressly requested a Remmer hearing, and the district court itself understood that the redneck remark was potentially prejudicial. Because the potentially prejudicial extrinsic communication presented a likelihood of affecting the verdict, this court’s precedents required the district court to afford Taylor a meaningful opportunity to prove actual bias. Moreover, the majority’s concern that further questioning could have exacerbated the comment’s potentially prejudicial effect[3] fails to consider that two weeks after the juror interviews the district court itself reminded the jurors of the comment.[4] Further, if a trial court can simply refuse to hold a Remmer hearing to avoid highlighting a prejudicial extraneous influence, the right to such a hearing is virtually nonexistent.
The majority also distinguishes United States v. Davis, 177 F.3d 552 (6th Cir.1999), and United States v. Herndon, 156 F.3d 629 (6th Cir.1998). Noticeably absent from the majority’s discussion of Davis is the Davis court’s reliance on a third factor: “the fact that the information that prompted the fear was provided by an extraneous source.” 177 F.3d at 557. This fact is critical because, as Davis recognized, although “a new trial will not be necessary every time a question of juror partiality is raised[, wjhere a colorable claim of extraneous influence has been raised, however, a ‘Remmer hearing’ must be held to afford the defendant an opportunity to establish actual bias.” 177 F.3d at 557 (internal quotation marks omitted). Such a claim is present here. Nevertheless, the majority concludes that the absence of the two other factors — that the juror was “clearly motivated by fear of retaliation from the defendants” and that “a number of jury members openly agreed that a person in [the juror’s] predicament should seek to be removed from the panel,” id. — adequately distinguishes Davis. But these were simply the circumstances of Davis; each case will necessarily involve different facts. It does not follow that the general rule that a Remmer hearing is required where a colorable claim of extraneous influence has been raised is not applicable. Moreover, it is not true that Davis relied on “the total absence” of an investigation as a basis for the court’s holding that the district court erred in not questioning the remaining jurors. Rather, the total lack of an investigation was the basis of the court’s holding that neither the trial court nor this court could determine whether the extraneous communications were harmless. 177 F.3d at 557. Finally, the majority’s statement that the district *383 court here “conducted individualized conferences with the jurors specifically to determine whether they had been prejudiced by the reported remark” misapprehends the court’s and Taylor’s role. The court has a duty to investigate the allegation and Taylor has the burden to prove actual bias. By refusing to further question Juror One and denying Taylor an opportunity to do so, the court deprived Taylor a meaningful opportunity to prove bias.[5]
The majority distinguishes Herndon on the basis that here “the district court asked all of the jurors about the extent to which they were aware of the reported remark.” Maj. Op. 350. This characterization of the facts omits the critical fact that the court did not question Juror One (and only Juror One) whether she could continue to serve as an impartial juror. And Herndon suggests it is error to fail to obtain a juror’s personal assurance of impartiality when the juror is exposed to an unauthorized outside communication. 156 F.3d at 637 (observing that the trial “judge not only failed to adequately investigate the allegation of juror partiality, but the juror never personally assured the court of his impartiality”).
The majority concludes the transcripts of the court’s in camera interviews with the jurors “gave Taylor the required opportunity to establish juror bias.” Maj. Op. 350. Had the court questioned Juror One regarding her ability to remain impartial, I might agree. In any event, our precedents require a meaningful opportunity to prove actual bias in an evidentiary hearing. See Corrado, 227 F.3d at 536 (holding that “district court abused its discretion by failing to conduct an adequate evidentiary hearing into the allegations of extraneous influences on the jury pursuant to the holding in Remmer ” and remanding for a hearing at which the defendant “should be accorded the opportunity to question the jurors individually and under Qath”); Herndon, 156 F.3d at 637 (holding that “the district court must provide the defendant a meaningful opportunity to prove [juror bias]”); United States v. Walker, 1 F.3d 423, 431 (6th Cir.1993) (“By denying the reasonable request to inquire into the jurors’ states of mind, the defendants were deprived of the opportunity to meet their burden of proving actual juror bias----”); see also Remmer, 347 U.S. at 230, 74 S.Ct. 450 (holding that the district court “should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a ■hearing with all interested parties permitted to participate”).
The majority correctly obseryes that Taylor focuses his appellate argument on the district court’s failure to further question Juror One. In other words, Taylor contends the district court failed to discharge its duty to investigate the impact of the outside communication on the juror’s ability to continue to serve as a fair and impartial juror. The import of asking the juror whether she could put the comment aside and decide the case based solely on the evidence and law given by the court is not inconsequential. A district court “may rely [on a juror’s assurance of continued impartiality] in deciding whether a defendant has satisfied the burden of proving actual prejudice,” if the court finds the juror’s assurance credible. United States v. Pennell, 737 F.2d 521, 533 (6th Cir.1984) (discussing Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). But *384 absent such assurance, the court cannot fully assess whether a juror who is exposed to an outside communication can remain impartial. See Corrado, 227 F.3d at 537; United States v. Davis, 177 F.3d 552, 557 (6th Cir.1999) (holding that because “the [trial] judge did not inquire of the remaining jurors whether they were influenced in any manner, ... further inquiry seems not only appropriate, but necessary to ensure the impartiality of the jury”).[6] For example, in Pennell, this court held the district court did not abuse its discretion in denying the defendant’s motion for a mistrial based on several jurors’ testimony that they had received late-night telephone calls threatening that they “had better find [the defendant] guilty,” because, unlike here, “the court immediately conducted a Remmer hearing ... and thoroughly questioned the contacted jurors on an individual basis and concluded that their assertions of unimpaired impartiality were worthy of belief.” Id. at 529, 534 (emphasis added).
In United States v. Walker, 1 F.3d 423 (6th Cir.1993), the district court inadvertently allowed inadmissible portions of deposition transcripts to enter the jury room. Id. at 427. After learning of the mistake, the district court interviewed the jurors individually in chambers and with counsel present to determine how the jury used the transcripts. Id. at 430. The court learned that the jurors did not read the inadmissible portions, but did read portions of testimony the court allowed the Government to show by video (but did not admit as an exhibit) and thus the jury was doubly exposed to the testimony. Id. at 426, 430. The court did not, however, ask the jurors whether the transcripts had influenced their ability to be fair. Id. at 430. Defendants suggested the court inquire of the jurors whether their double exposure would make them believe they could no longer be fair and impartial. Id. The court disregarded the suggestion and provided a precautionary instruction to the jury, directing the jury not to consider the transcripts. Id. at 431. This court held that “[b]y denying the reasonable request to inquire into the jurors’ states of mind, the defendants were deprived of the opportunity to meet their burden of proving actual juror bias, and were thereby denied a fair trial.” Id. at 431.
The majority distinguishes Walker because, in its view, that case involved a “highly prejudicial communication.” Maj. Op. 350. In effect, the majority determines the unauthorized communication here was not prejudicial to Taylor, notwithstanding that the district court denied *385 Taylor a hearing to prove actual prejudice. Our cases involving the wrongful denial of a Remmer hearing have uniformly remanded where the extraneous statement had a potential for prejudice, because the lack of a hearing precludes a finding that the exposure was harmless. See, e.g., Davis, 177 F.3d at 557. We simply are not in a position to decide whether Juror One’s exposure to extraneous information was. harmless. Our task is to determine whether a Remmer hearing is required, which depends on whether the “alleged contact presents a likelihood of affecting the verdict.” Mack, 729 F.3d at 606. The district court assumed the statement was prejudicial, and reasonably so. (PID 2053 n.5.) This court has recognized that the term “redneck” is at least “mildly offensive.” Defoe ex rel. Defoe v. Spiva, 625 F.3d 324, 327 n. 2 (6th Cir.2010). An accusation of racism may be prejudicial, too. See Armstrong v. Shirvell, 596 F.App’x 433, 442 (6th Cir.2015) (noting that the term “racist” has a clear, well understood meaning, which is capable of being defamatory). Because the comment had a likelihood of affecting the sentence, the court should have granted Taylor’s request for a Remmer hearing.[7] I would, therefore, remand for a hearing at which Taylor must be afforded a meaningful opportunity to prove bias.[8]
Ground II
Taylor argues that Aiken’s and Dr. Cunningham’s testimony was admissible to rebut the Government’s evidence of Taylor’s future dangerousness. The Constitution and FDPA give a defendant the right to rebut the government’s allegation of future dangerousness with relevant evidence. See Davis v. Coyle, 475 F.3d 761, 771 (6th Cir.2007) (discussing due process requirements outlined in Skipper v. South Carolina, 476 U.S. 1, 5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)); 18 U.S.C. § 3593(c) (“At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered.... The government and the defendant shall be permitted to rebut any information received at the hearing....”). Taylor also contends the expert testimony was independently admissible as mitigation. (Taylor Br. 110.)
The majority characterizes the Government’s allegation of future dangerousness narrowly and concludes that the excluded expert testimony “was not relevant rebuttal evidence on future dangerousness, because none of it rebutted any of the Government’s future dangerousness arguments,” because, in its view, “[a]t no point in the proceedings did the Govern *386 ment seriously contend — or even intimate — that Taylor was personally dangerous.” Rather, “any such argument would have been patently absurd given Taylor’s slight stature----” Maj. Op. 862-63; see also id. at 360. The majority also quotes approvingly from the district court’s order excluding the expert testimony as irrelevant because “no rational fact finder could conclude [Taylor] is likely to personally injure someone while in custody, whether a fellow inmate or a prison staff member.” Maj. Op. 357 (quoting Mem. Op., R. 744, PID 2242.). Based on the Government’s evidence, the court concluded: “Appropriate rebuttal to the government’s evidence in this case would be information that it would be impossible for Defendant to ever communicate with anyone outside of prison for the rest of his life or that he would not be able to influence any other inmates while in prison.” Id. (quoting PID 2242).
This characterization of the evidence is unsupported by the record. The jury heard testimony regarding the escape plan, which resulted in injury to two correctional officers and in which a pipe was going to be used against prison officials. (PID 2296, 4313, 4358, 4721, 4734.) The jury learned that Taylor physically “tried to hold [an] officer down” during the escape attempt. (PID 4315, 4359, 4724.) The jury also heard that Taylor took an officer’s radio and tried to help another inmate drag an injured officer into a cell. (PID 7316.) The inmate who hatched the plan, J.R. Uhuru, stated that “Rejón did what he was supposed to do.” (Id.) Although Taylor may not have injured the officer, the jury could have inferred from the escape attempt that Taylor might physically harm another person while in prison. See United States v. Anglin, 169 Fed.Appx. 971, 975 (6th Cir.2006) (observing that “escape is a crime of violence” in the context of a prison break). Moreover, the majority’s narrow understanding of the evidence overlooks the obvious fact that led to his conviction: Taylor killed Guy Luck.[9] Thus, it is flatly incorrect that “the government has introduced no evidence that [Taylor] is likely to pose a danger of personally injuring another inmate in prison or personally attacking a prison staff member.”[10] (PID 2245.)
The majority’s “unrealistically limited” view of the evidence echoes the same “fallacy” the Supreme Court rejected in Kelly v. South Carolina, 534 U.S. 246, 254-55, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002). In that case, the Court determined that the South Carolina Supreme Court erred “on the facts” because the evidence and arguments in the case were “flatly at odds with the view that future dangerousness was not an issue in the case.” Id. at 253, 122 S.Ct. 726 (internal quotation marks omitted). At Kelly’s trial, the prosecutor presented “evidence that Kelly took part in escape attempts and carried a shank, and that he had been caught carrying a weap *387 on and planning or participating in escape attempts.” Id. (internal quotation marks omitted). Like the majority here, the state supreme court “overlooked” that this “evidence of violent behavior in prison can raise a strong implication of generalized future dangerousness.” Id. Evidence of “Kelly’s likely behavior in prison, or his proclivity to escape from it,” was evidence from which a jury could “conclude that he presents a risk .of violent behavior” and thus a future danger to others. Id. at 253-54, 122 S.Ct. 726. Moreover, the Court noted that, as the majority does here, the state court said “nothing about the evidence of crime.” Id. at 253, 122 S.Ct. 726.
With the proper understanding that “[ejvidence of future dangerousness ... is evidence with a tendency to prove dangerousness in the future,” Taylor’s experts should have been permitted to testify about the U.S. Bureau of Prisons’ (BOP) likely security arrangements to manage Taylor’s propensity for violence — whether through direct means or otherwise. Id. at 254, 122 S.Ct. 726. Dr. Cunningham’s testimony about United States Penitentiaries’ security procedures is relevant to rebut the allegation that Taylor’s earlier escape attempt, during which he attempted • to physically restrain an officer, indicated future dangerousness. Indeed, as the majority recognizes, “a district court might reasonably consider Dr. Cunningham’s summary of BOP studies as relevant evidence to rebut allegations that an individual might be directly dangerous in the future.” Maj. Op. 362. In addition, Dr. Cunningham and Aiken proffered that the BOP would monitor and control Taylor’s ability to influence other inmates and persons in the public — for example, by monitoring his communications. That testimony is relevant to rebut negative inferences from Taylor’s alleged threat against Marshall, his use of other inmates to communicate with persons outside a detention facility, and the alleged damage to MarshalPs grandmother’s home.
Due process, as well as the FDPA, allows a capital defendant to present to the jury “all possible relevant information” to rebut the future-dangerousness aggravator. Jurek v. Texas, 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality opinion); 18 U.S.C. § 3593(c). The district court thus abused its discretion, and the error was not harmless beyond a reasonable doubt. The court instructed the jury that the Government introduced evidence pertaining to Taylor’s “involvement in an escape attempt” as evidence supporting the future-dangerousness aggravator, but drastically limited Taylor’s ability to rebut the allegation. (PID 7766.) The jxxry subsequently found the aggravating factor “tends to support imposition of the death penalty.” (PID 2288.) I would vacate Taylor’s death sentence and remand for a new sentencing hearing.[11]
Ground III
Under the FDPA, a party may present information relevant to establish or rebut any mitigating or aggravating factors. See 18 U.S.C. § 3593(c); Sears v. Upton, 561 U.S. 945, 950, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010). But such information “may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.” 18 U.S.C. § 3593(c).
Agent James Melia testified that Inez Marshall (Marshall’s grandmother or godmother) called and told him “it appeared *388 that somebody had tried to break into her residence” because the alarm had sounded, which had never happened before, and that all the windows in another of Marshall’s relative’s house “had been broken out of the house.” (PID 7299.) The allegations, as relayed by Agent Melia, came from second- and perhaps third-hand sources: Ms. Marshall and an unknown relative. Neither person testified, and the Government provided no reason for their absence. More importantly, Agent Melia did not verify the information and there is no indication whether Ms. Marshall had personal knowledge of the alleged property destruction to her relative’s house. The Government offered no evidence corroborating the alleged attempted break-in and property damage and, indeed, concedes these instances could have been mere coincidences wholly unrelated to Taylor’s prosecution.
The majority contends the statements are relevant to put Taylor’s letter to his girlfriend in context,[12] to Taylor’s level of remorse, and to the future-dangerousness aggravator.[13] Assuming the allegations are true, to reach the conclusion that the statements are relevant, however, one must also assume that (1) Taylor ordered the actions through an outside associate, and (2) the actions were in retaliation against Marshall (via his relatives) for his testimony. The first inference seems unlikely, given that the Government provided no evidence suggesting Taylor ordered an associate to attack Marshall’s family, despite the fact that it monitored his communications. The second inference seems similarly implausible considering Marshall’s testimony that, even after he decided to testify against Taylor, he never felt threatened by Taylor. (PID 6718.) Because these inferences are unsupported, the statements lack an apparent or demonstrated connection to Taylor. The statements, therefore, are irrelevant. Further, any probative value is outweighed by the danger of unfair prejudice.
The Government does not argue harmlessness in its brief, perhaps because it cannot prove the admission of the evidence was harmless beyond a reasonable doubt. The district court instructed the jury to consider “the harm to the home of Joey Marshall’s grandmother” as evidence supporting the future-dangerousness aggravator. By allowing the jury to consider the statements, the court in effect inferred for the jury that Taylor could somehow direct crime from prison, although there was no evidence to support such a conclusion. The jury unanimously found the future-dangerousness aggravator and determined that the factor tended to support the death penalty. Thus, the statements likely affected Taylor’s sentence.
Ground V
I agree that Taylor has not shown plain error with regard to his claim of prosecu- *389 torial misconduct and, therefore, join Part V of the majority opinion. I add that another aspect of the Assistant U.S. Attorney’s rebuttal summation is troubling. This court affords prosecutors “wide latitude” during closing argument. United States v. Lawrence, 735 F.3d 385, 431 (6th Cir.2013). However, a prosecutor “may not urge jurors to identify individually with the victims.” United States v. Boyd, 640 F.3d 657, 670 (6th Cir.2011). And although a prosecuting attorney may argue that “the people in the community have the right to expect that you will do your duty,” Lawrence, 735 F.3d at 433 (quoting Hicks v. Collins, 384 F.3d 204, 219 (6th Cir.2004)), “[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future law breaking,” United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir.1991). “[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury’s emotions and fears — rather than the evidence — to decide the case.” Johnson v. Bell, 525 F.3d 466, 484 (6th Cir.2008).
After analogizing Taylor to Mr. Hyde, the prosecutor argued the following to the jury:
Now, what do we do about this? What’s the plan of action? Ladies and gentlemen, society has a right to self-defense, just like the victim Mr. Luck had a right to defend himself. He fought tooth and nail to defend himself. He had every right to kill the defendant to protect himself and to defend himself, and so do you. He couldn’t finish what he had the right to start. You not only have the right but you have the obligation to finish it.
A lot of times you’ll hear people talking about the horrible things that happen in the community — “When are they going to do something about that?” Well, ladies and gentlemen, you are now they. When it comes to Rejón Taylor, you are the ones that have to do something about it. You are the ones who have the obligation to be the sheep dog that protects the sheep, and even sometimes the wolves, from the wolf.
(PID 7755-56.) Although Taylor did not object to this part of the prosecutor’s argument and does not raise an issue on appeal, the prosecutor’s argument was improper and should not be repeated.
Ground VIII
The FDPA requires a capital jury to return special findings regarding any relevant aggravating factors listed in 18 U.S.C. § 3592, and if the jury does not unanimously find a statutory aggravator, the court must impose a lawful sentence other than death. 18 U.S.C. § 3593(d). In this case, the jury found two statutory aggravators: Luck died during the commission of a kidnapping, § 3592(c)(1), and Taylor committed the murder after substantial planning and premeditation to cause Luck’s death, § 3592(c)(9). Taylor argues there is insufficient evidence to support the jury’s finding of the substantial-planning-and-premeditation aggravator. This court will uphold the jury’s verdict if, viewing the evidence in the light most favorable to the government, “any rational trier of fact could have found the existence of the aggravating factor beyond a reasonable doubt.” United States v. Lawrence, 735 F.3d 385, 415 (6th Cir.2013).
A.
Substantial planning and premeditation relate to the offense of murder, not to the offense of conviction. See United States v. Webster, 162 F.3d 308, 325 (5th Cir.1998). The Fourth Circuit defines substantial planning and premeditation as “ ‘a higher degree of planning than would have the *390 words ‘planning and premeditation’ alone — i.e., more than the minimum amount sufficient to commit the offense.’ ” United States v. Jackson, 327 F.3d 273, 301 (4th Cir.2003) (citing United States v. Tipton, 90 F.3d 861, 896 (4th Cir.1996)). Similarly, the Fifth Circuit defines substantial as “a thing of high magnitude,” and substantial planning and premeditation as “requiring a considerable amount of planning preceding the killing.” United States v. Snarr, 704 F.3d 368, 392 (5th Cir.2013) (citing United States v. Flores, 63 F.3d 1342, 1373-74 (5th Cir.1995); United States v. Davis, 609 F.3d 663, 690 (5th Cir.2010)).
B.
Two years before the crime, Taylor and his codefendants began taking various persons’ mail to obtain personal and financial information. They used this information to fraudulently apply for and receive credit cards to purchase electronics, clothes, and other items. (PID 6585-86.) To gather additional personal identification information, they broke into some of the victims’ homes while the occupants were away. (PID 6586-87.) They always took with them gloves, wire cutters, and a crowbar. (PID 6589, 6592.) One victim of this scheme was Guy Luck. (PID 6591.) They did not know Luck. (PID 6591.)
While stealing Luck’s identity, Taylor learned that Luck owned a French restaurant. (PID 6594.) Marshall and Taylor visited the restaurant, although only Taylor went inside and ordered food. (PID 6595.) Marshall testified that Taylor thought the meal was expensive, which prompted them to question what Luck did with the restaurant proceeds. (PID 6598.) From following Luck, Taylor learned that every night when the restaurant closed, Luck would return home and then drive to the bank in the morning. (PID 6599.) Subsequently, Taylor and Marshall conspired to rob Luck of that money and recruited Matthews to help. (PID 6599-6600.) Both Marshall and Matthews testified that the plan was always to rob Luck and not to murder or hurt him. (PID 6649; App. 141.)
On the morning of the murder, the three went to Luck’s house in Taylor’s Impala, bringing with them the same tools they use for burglaries, including gloves and wire cutters, but also wielding loaded guns. {See PID 6601-03; App. 140.) The record is unclear regarding who supplied or obtained the guns. Marshall testified that Taylor and Matthews picked him up and the two guns were already sitting in the car. (PID 6600-01.) He added someone gave him the .38 revolver, but could not remember who, and that Matthews took the 9mm pistol. (PID 6602.) Matthews stated that Taylor and Marshall picked him up, and when he got in the car the guns were on the floor. (App. 172-73.)
According to Marshall, when they arrived at Luck’s house, Marshall and Matthews got out of the Impala and prepared to confront Luck. (PID 6602-03.) Marshall soon returned to the car because he did not think the circumstances were ideal. {Id.) After discussion, Matthews agreed to hide under Luck’s white van in the driveway and wait for Luck to exit his house. (PID 6603.) Taylor and Marshall stayed in their vehicle and rode around the neighborhood, until they noticed Matthews walking Luck back toward the house. (PID 6604.) Seeing this, Taylor jumped out of the car and ran toward the driveway; Marshall drove off, throwing his .38 revolver and gloves into the center console. {Id.)
In contrast to Marshall’s testimony, Matthews’s FBI interview states that:
Matthews pointed a gun at [Luck], grabbed the collar of his shirt, and start *391 ed walking him back into the house. Marshall and Taylor drove up into the driveway, exited the Impala, and went into the house as well. All four persons went immediately into Luck’s bedroom. Matthews gave the 9mm to Taylor who stayed in the bedroom with Luck and attempted to get Luck to tell him the pin numbers for his credit cards. Luck was so nervous that he was not able to provide the numbers.
Matthews heard Taylor tell Luck, “[I]f you shut these credit cards down I’m going to come for you.” Matthews interpreted this as a threat against Luck’s life if Luck reported the cards stolen. While Taylor was in the bedroom, Marshall and Matthews searched the rest of the house. Matthews saw Taylor with Luck’s credit cards and knows Taylor made Luck turn out his front pockets where he found approximately $600 cash.
Following the search of the house and while in the bedroom Luck was still not able to provide the pin numbers for the cards Taylor stated, “We gonna take him for a ride.”
(App. 141) (Capitalizations removed.)
Eventually, Taylor and Matthews forced Luck into the back of the van: Taylor got in the driver’s seat, and Matthews got in the back to watch over Luck. (PID 6604.) 'When Marshall drove back around, the white van Was at the top of the street, and Taylor signaled for Marshall to follow him. (PID 6605.) Marshall complied with Taylor’s request, although he claims that he did not know Luck and Matthews were in the back of the van, and he had no idea what was going on. (PID 6605-06.)
With Marshall following in the Impala, Taylor got on Interstate 75 and drove away from Atlanta. (Id.) After driving 45 minutes to one hour, Taylor pulled over on to the side of the highway and got out of the van to talk with Marshall. (Id.) Taylor gave Marshall his mother’s credit card to get some gas for the Impala. (Id.) Marshall asked Taylor what he was doing and where he was going, and Taylor told him he was looking for a place to leave the van. (Id.) According to Matthews’s FBI statement, the plan was to leave Luck on the side of the road somewhere far away, so they could get away before Luck reported the robbery. (App. 142)
Before Taylor went back to the van, he allegedly told Marshall, “That’s the guy who took the warrant out on me.” (PID 6606.) Marshall knew that Taylor had a warrant in Rockdale County, and asked Taylor how he knew. (Id.) According to Marshall, Taylor responded, “I seen some papers in the house that said Rockdale County.” (Id.) When searching Luck’s house, Detective Dunn found a paper among the piles of documents on Luck’s desk that said, “The thieves identified by Matthew K. Wolfe.” (PID 4658; App. 124.) That document had the words “Rockdale County” on it. (App 124.)
After Taylor went back to the van, he and Matthews waited in the van, watching over Luck, on the side of the highway. (PID 6607.) Marshall went to the next exit, got gas, and returned to follow Taylor. (Id.) Looking for a suitable place to drop off Luck and leave the van, they drove for another 30 to 45 minutes. (Id.)
They exited off the Interstate, to a rural area in Collegedale, Tennessee. (Id.) According to Matthews, Taylor slowed the van to let Luck out and Matthews got up to unlock the van’s side door. (App. 142.) Luck took advantage of this situation and tried to escape: He fought back and jumped on Matthews’s back. (Id.) While the van was still moving, Luck supposedly grabbed at Matthews’s 9mm pistol, and they began to fight for the weapon. (Id.) Matthews pushed Luck off, and fired one *392 shot at him, hitting Luck in his right arm. (Id.) However, Luck was able to get Matthews in a chokehold, and Matthews dropped the pistol, which jammed. (Id.) While trying to drive, Taylor turned around in the driver’s seat and fired three shots from the .38 revolver.[14] (R. 867-Sealed, PID 4961.) The shot that proved fatal struck Luck in his upper mouth. (PID 6611-12; 4963-65.) The order in which the shots hit Luck could not be determined. (PID 4962-63.)
The van veered off the road and almost crashed into the creek. Taylor and Matthews quickly jumped out. They left their guns and a pair of gloves in the front of the van, and left Luck bleeding out, but alive, in the back. (PID 6607-09.) The .38 revolver had two live rounds left in it. (PID 6510.) A witness who had seen the van veer off the road stopped and asked if everything was fíne. (App. 142). Taylor and Matthews told the witness everything was okay, and Marshall pulled up in the Impala to pick them, up. (Id.; PID 6608.) Taylor and Matthews ran to the car; Taylor flipped down the Impala’s license plate; and they sped back toward Atlanta. (PID 6608.)
The group arrived back in Atlanta, and Marshall dropped Taylor off, then drove home with Matthews. (PID 6615.) Matthews showered and washed off the blood, and Marshall covered the Impala with a car cover. (PID 6615-16.) Taylor told Marshall he would have somebody come by and get the car later. (PID 6615.) When Matthews got out of the shower, Marshall took Matthews’s bloody clothing, which he burned the next day, and gave him new clothes. (PID 6615, 6638.) Marshall had a friend drive him and Matthews to the hospital, and later that day, Taylor, Marshall, and two friends ate at Red Lobster. (PID 6617-18, 6623.)
C.
At trial, the Government proposed two theories of Taylor’s intent. The first theory was that Taylor, without telling his code-fendants, planned all along to kill Luck. The second and more apparent theory is that Taylor originally did not intend to kill Luck when he went to Luck’s house, but after seeing the document regarding the identity theft in Rockdale County on Luck’s desk, decided then to murder Luck and thereby eliminate him as a witness.
The Government’s first theory is wholly unsupported by the record. The second theory, however, has some evidentiary support because Marshall testified that Taylor identified Luck as a possible witness against him based on a document he had seen on Luck’s desk. However, assuming Taylor intended to eliminate Luck as a witness by murdering him, he developed that intent while inside Luck’s house. Thus, any planning Taylor had completed before that point is irrelevant to whether he substantially planned and premediated the murder. What remains, then, is the nearly two-hour drive from Atlanta to Col-legedale.
Without offering a definition of the term “substantial,” or providing a single citation to authority, the majority concludes that the Government “provided sufficient evidence of planning and premeditation in this case and so Taylor’s sufficiency argument fails with respect to that aggravator.” Maj. Op. 369. But, the FDPA requires a finding of substantial planning and premeditation; mere planning and *393 premeditation will not do. 18 U.S.C. § 3592(c)(9).
To support its conclusion that Taylor substantially planned and premeditated the murder, the majority cites four pieces of evidence: (1) Taylor brought guns but not masks to Luck’s home on the day of the crime, unlike in his burglaries; (2) Taylor allegedly saw the document regarding Rockdale County on Luck’s desk; (3) Taylor drove for two hours; and (4) after the crime, Taylor flipped down the license plate, was calm, and went out to eat at Red Lobster.
First, although defendants had not taken guns with them when they burglarized unoccupied homes, they had not previously planned a robbery. Moreover, the majority’s statement that “the lack of masks is evidence that this was not just another robbery attempt” is unsupported. Maj. Op. 368. The majority cites Matthews’s plea agreement, which states, “On August 6, 2003, unlike the previous burglaries, the defendants and Taylor brought guns but did not use gloves, masks, and burglary tools as they had before at Mr. Luck’s residence.” (App. 130.) But Matthews specifically crossed out the word “masks” in the plea document. (Id.) Likewise, at trial, Marshall did not testify to using masks in their burglaries. (PID 6588-90.) Second, although the plea document supports the Government’s witness-elimination theory, without more, it does not prove substantial planning and premeditation. Third, I concede the two-hour drive is significant. However, the evidence suggests Taylor killed Luck because Luck struggled with Matthews, thwarting Taylor’s plan to deposit Luck — alive—in a remote area so that they could prolong or evade detection and apprehension.[15] Fourth, accepting the majority’s premise that Taylor’s actions after the shooting can evince premeditation and planning of a murder, Taylor’s post-shooting conduct does not show a considerable amount of planning of the murder.
Marshall and Taylor, together, devised a plan to rob Luck. However, both Matthews and Marshall testified there was never a plan to murder, or even hurt, Luck. After Luck began to struggle with Matthews, Matthews shot first, then Taylor shot three rounds toward the rear of the van while driving. Taylor left Luck injured but alive and with two rounds remaining in the revolver. All this suggests a lack of substantial planning. In sum, a juror could not have reasonably found beyond a reasonable doubt that Taylor substantially planned and premeditated Luck’s murder after viewing the document on Luck’s desk.
Ground XV
After oral argument in this case, the Supreme Court held the Armed Career Criminal Act’s (ACCA) residual clause unconstitutionally vague, Johnson v. United States, — U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), and we granted Taylor’s request to permit supplemental briefing. Taylor argues that because 18 U.S.C. § 924(c)(3)(B) — the statute providing the definition of “crime of violence” underlying his § 924(j) convictions — contains language substantially similar to the ACCA’s residual clause, Johnson renders § 924(c)(3)(B) unconstitutionally vague as well.
*394 In Johnson, the Supreme Court held that two features of the ACCA’s residual clause — the use of the categorical approach and uncertainty about the level of risk required for an offense to qualify as a “violent felony” under the statute — “conspire to make it unconstitutionally vague.” 135 S.Ct. at 2557-58. In so holding, the Court found dispositive that the residual clause “ties the judicial assessment of risk to a judicially imagined ‘ordinary case’ of a crime, not to real-world facts or statutory elements,” id. at 2257, and that it “leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony,” observing, “[i]t is one thing to apply an imprecise ‘serious potential risk’ standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction,” id. at 2558.
Section 924(c)(3)(B)’s definition of “crime of violence” is substantially similar to the ACCA residual clause’s definition of “violent felony,”[16] and suffers from the same pair of infirmities that rendered the residual clause unconstitutional. First, it requires courts to use a categorical approach, “looking to the language of the statute, rather than the particular facts” of a case to determine whether an offense constitutes a “crime of violence,” Evans v. Zych, 644 F.3d 447, 453 (6th Cir.2011), thereby tying “the judicial assessment of risk to a judicially imagined ‘ordinary case’ of a crime.” See Johnson, 135 S.Ct. at 2557. And, like the ACCA’s residual clause, § 924(c)(3)(B) requires courts to apply an imprecise “substantial risk” standard to this “judge-imagined abstraction.” See id. at 2558.
Recognizing that § 924(c)(3)(B) requires courts to use ordinary-case analysis, the majority nonetheless concludes that because § 924(c)(3)(B) is narrower than the ACCA’s residual clause, and because “much of Johnson’s analysis does not apply to § 924(c)(3)(B),” Maj. Op. 375-76, Johnson does not render § 924(c)(3)(B) unconstitutionally vague. The majority focuses on a number of distinctions between the language of § 924(c)(3)(B) and the ACCA’s residual clause that it contends remove § 924(c)(3)(B) from Johnson’s scope. See Maj. Op. 376-77. However, to ■ the extent § 924(c)(3)(B)’s language differs from the ACCA’s residual clause, the language differences do not render the provisions meaningfully different under Johnson.
A.
The majority first contends that § 924(c)(3)(B) is materially different from the ACCA’s residual clause because the language “by its nature” in § 924(c)(3)(B) — in contrast to the residual clause’s “involves conduct” — limits the court’s inquiry to the elements of the crime. Maj. Op. 376-77. However, a court’s inquiry under § 924(c)(3)(B) is no more limited to the elements of the offense *395 than it was under the ACCA’s residual clause. In Johnson, the Court observed that the residual clause required courts to go “beyond deciding whether creation of risk is an element of the crime” because “unlike the part of the definition of a violent felony that asks whether the crime ‘has as an element the use ... of physical force,’ the residual clause asks whether the crime ‘involves conduct ’ that presents too much risk of physical injury.” Johnson, 135 S.Ct. at 2557. Like the ACCA, § 924(c) employs two alternative clauses— a use-of-force-as-element clause and a risk clause. And, like the ACCA residual-clause inquiry, the “by its nature” risk inquiry asks whether notwithstanding that the offense does not have the use of force as an element, the offense as usually committed presents an unacceptable risk that force will be used. The majority reasons that the “by its nature” language ties the risk inquiry to the elements of the offense, but because the risk inquiry contemplates that force is not an element — if it were, the use-of-force clause would be operative — an intrinsic feature of the risk inquiry is that looks to the hypothetical, usual case and assesses the risk of force involved in its commission. Because the risk inquiry under § 924(c)(3)(B) is untethered either to specific elements or to actual conduct, any potentially “narrowing” language in the statute narrows the risk inquiry only to the extent judges can agree on what the “ordinary” offense entails “by its nature.” And, like the ACCA’s residual clause, § 924(c)(3)(B) “offers no reliable way to choose between ... competing accounts of what an ‘ordinary’ [crime] involves” by its nature. Johnson, 135 S.Ct. at 2558. Thus, although I agree that the Johnson Court found the ACCA residual clause inquiry too broad in part because its definition of “violent felony” “did not limit a court’s inquiry to the elements of the crime,” see Maj. Op. 377, § 924(c)(3)(B) suffers from the same infirmity. The risk clause’s “by its nature” language is an alternative to the “elements” language, and thus contemplates evaluation of the “usual case.” See 18 U.S.C. § 924(c)(3); see also Johnson, 135 S.Ct. at 2557.
B.
The majority next reasons that unlike the ACCA’s residual clause, § 924(c)(3)(B) “does not allow courts to consider conduct occurring after the crime has been committed” because it requires that “physical force be used in the course of committing the offense.” Maj. Op. 376-77 (internal quotation marks omitted). There is no question that the “in the course of’ language is narrower than the residual clause, but this does not make § 924(c)(3)(B) less vague under Johnson’s reasoning.
The majority invokes Johnson’s concern that “ ‘the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that’ a court could evaluate the risk of injury arising after the crime has been completed, since ‘[t]he act of making an extortionate demand or breaking and entering into someone’s home does not, in and of itself, normally cause physical injury.’ ” Maj. Op. 377 (quoting Johnson, 135 S.Ct. at 2257). Thus, the majority reasons, while the residual clause’s inquiry is open ended, the § 924(c)(3)(B) inquiry is cabined to risk during the course of the offense. But in Leocal v. Ashcroft, 543 U.S. 1, 10, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), the Supreme Court invoked burglary as a “classic example” of a crime of violence under 18 U.S.C. § 16(b), which, as the majority notes, uses the same “in the course of committing the offense” language as § 924(c)(3)(B). And this court analogized escape from a detention facility to burglary in finding the former a crime of violence under § 16(b), focusing on the risk of detection and con *396 frontation, not the risk of force normally involved in the act of escaping. See United States v. Stout, 706 F.3d 704, 708-09 (6th Cir.2013).[17] Thus, although § 924(c)(3)(B), like § 16(b), is narrower than the residual clause in that it focuses on “the risk that the use of physical force against another might be required in committing a crime,” Leocal, 543 U.S. at 10, 125 S.Ct. 377, the cases demonstrate that the phrase “in the course of committing the offense” has not consistently been interpreted to exclude consideration of the risk of force after the offense has technically been completed.
Further, application of the “in the course of committing the offense” limiting language does not help narrow the application of the “substantial risk” standard to an imagined ordinary case. Section 924(c)(3)(B) still suffers from the indeterminacy this idealized-offense analysis created in the residual clause. Indeed, the Supreme Court itself has taken inconsistent positions on whether the risk of force or injury from burglary arises in the course of committing the idealized offense of after. Compare Johnson, 135 S.Ct. at 2557 (“[T]he inclusion of burglary ... among the enumerated offenses preceding the residual clause confirms that the court’s task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone.”), with Leocal, 543 U.S. at 10, 125 S.Ct. 377 (“A burglary would be covered under § 16(b) ... because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime.”). Thus, § 924(c)(3)(B)’s narrower language does not render it meaningfully different from the ACCA’s residual clause under Johnson.[18]
C.
The remaining distinctions the majority draws between the two statutes do not save § 924(c)(3)(B). The majority notes that unlike the ACCA’s residual clause, § 924(c)(3)(B) does not require courts to interpret the level of risk with respect to *397 “four enumerated but diverse crimes.” Maj. Op. 377. However, although the Johnson Court found relevant that the enumerated offenses preceding the ACCA’s residual clause created additional confusion for courts interpreting the term “serious potential risk,” it then reiterated that the key feature that rendered the residual clause unconstitutional was “combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony.” Johnson, 135 S.Ct. at 2558. Further, although the Court stated that its holding would not affect all statutes using terms such as “substantial risk” or “unreasonable risk” in part because most such statutes do not “link[] a phrase such as ‘substantial risk’ to a confusing list of examples,” id. at 2561, it then stated:
More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion. As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as “substantial risk” to real-world conduct; ... The residual clause, however, requires application of the “serious potential risk” standard to an idealized ordinary case of the crime. Because “the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect,” this abstract inquiry offers significantly less predictability than one “[t]hat deals with the actual, not with an imaginary condition other than the facts.”
Id. at 2561 (first emphasis added) (internal citations omitted). Like, the ACCA’s residual clause, § 924(c)(3)(B) assesses an idealized ordinary case, not actual facts.[19] Thus, the absence of enumerated offenses preceding § 924(c)(3)(B) hardly presents an “independently compelling difference” between this statute and the ACCA under Johnson’s reasoning. The majority’s contention that the Supreme Court’s repeated attempts and failures to interpret the residual clause “militates against” applying Johnson’s reasoning to § 924(c)(3)(B) fares no better. Although this consideration bolstered the Supreme Court’s conclusion in Johnson that the residual clause was unconstitutionally vague, it was not dispos-itive.
The government argues that even if the court considers § 924(c)(3)(B) vague in some cases, we need not find it unconstitutionally vague here because some conduct — including Taylor’s — clearly qualifies as a crime of violence. However, the Supreme Court rejected a similar argument in Johnson, stating that the Court’s “holdings squarely contradict the theory that a vague provision is constitutional merely *398 because there is some conduct that clearly falls within the provision’s grasp.” Johnson, 135 S.Ct. at 2561.
Finally, as the majority notes, two other circqits have addressed the issue now before the court in the context of challenges to § 16(b). Rejecting the very distinctions the majority advances, both held the statute unconstitutionally vague under Johnson. See United States v. Vivas-Ceja, 808 F.3d 719, 722-23 (7th Cir.2015); Dimaya v. Lynch, 803 F.3d 1110, 1114-20 (9th Cir.2015).
For these reasons, I would vacate Taylor’s two convictions under 18 U.S.C. § 924(j), vacate his sentence, and remand for resentencing.

. Because I conclude the district court committed reversible error regarding grounds II, III, and VIII, which requires resentencing, I do not address Taylor's arguments in Parts VI, VII, and XII.

. Taylor only objects to the failure to provide a Remmer hearing as to Juror One.

. This seems to be an acknowledgment of the likelihood of prejudice.

. At the beginning of the first day of sentencing, the court reminded the jury en masse that the ‘‘[w]eek before last I asked each of you individually some questions.” The court asked: "Will you be able to put out of your minds anything that you may have heard from the media, coworkers, neighbors, or any other source outside of the trial, in making a decision in this phase of the case? ... This would include any of the things we discussed in the individual discussions we had two weeks ago. Do you all understand that?” (PID 7235-36.)

. The majority seems more focused on the experience and good-faith of the trial judge than the dictates of Remmer. There is no question that the district judge is among the most careful and able judges, but even the best judges make mistakes, sometimes for the best of reasons.

. Although the district court questioned the jury en masse whether they could remain impartial, this court has held that a group inquiry does not satisfy Remmer's requirements; rather, at the Remmer hearing, "the defendant ] should be accorded the opportunity to question the jurors individually and under oath.” Corrado, 227 F.3d at 536-37; see also Goins v. McKeen, 605 F.2d 947, 949, 953 (6th Cir.1979) (concluding the court failed to assure the integrity of the trial because it questioned the jury en masse rather than individually and in chambers, and although the jurors who had read a prejudicial news article assured the court that they could decide the case based on the evidence). The majority distinguishes Corrado and Goins because the district court here "made a deliberate and concerted effort to investigate potential juror prejudice. Not only did the district court question the jurors in camera, one at a time, but it repeatedly asked followup questions when the need arose. The district court’s efforts here, then, were not at all like the cursory inquiries that were not adequate in Cormdo and Goins.” Maj. Op. 350. Although the district court's investigation was not cursory, it was also not complete. The court's refusal to ask Juror One whether she could remain impartial, along with its denial of Taylor's request for a Remmer hearing, *385 deprived him of a meaningful opportunity to prove the juror’s impartiality.

. Moreover, the charge of racism cannot be ignored in this cross-racial capital case. As the Supreme Court stated in Turner, a case involving a capital crime of interracial violence:
Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected .... More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner’s crime, might incline a juror to favor the death penalty.
The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence....
476 U.S. at 35, 106 S.Ct. 1683 (plurality opinion). Our adherence to binding precedents is all the more important in a federal cross-racial capital case, as the FDPA mandates that we independently consider whether the jury authorized the sentence of death under the influence of passion or prejudice.

. I recognize that a remand for a Remmer hearing is unnecessary if we vacate Taylor’s sentence and remand for resentencing, as I conclude we should do.

. The jury specifically found that Taylor intentionally killed Luck and intentionally inflicted serious bodily injury that resulted in Luck’s death. (PID 2286.)

. The Government’s closing argument described Taylor's dangerousness in generalized terms, as well. The Government emphasized the fact of the escape attempt and Taylor's role in the plot as evidence of future dangerousness. (PID 7709-10.) In addition, the jury charge was not limited to Taylor’s ability to influence others. The special verdict form reads: "Defendant would be a danger in the future to the lives and safety of other persons, and that this factor tends to support imposition of the death penalty.” (PID 2288; see also 7766 (jury instructions).) Moreover, the court instructed the jury that the Government introduced evidence pertaining to Taylor's "involvement in an escape attempt” as evidence supporting the aggravator. (PID 7766.)

. Because the court committed reversible error when it limited Taylor's ability to rebut the Government’s sentencing argument, I do not discuss Taylor’s second argument that the excluded testimony should also have been allowed as mitigation evidence.

. The letter seems to relate to the escape attempt. While in jail, Taylor and Marshall learned that older prisoners were planning an escape. Hoping for quick freedom, both Marshall and Taylor agreed to participate. The escape did not go as planned, everyone was caught, and Uhuru blamed Marshall for botching the escape and stated that "the word is already out in the federal joint I’m at about what Joey ... did.” (PID 7315.) In a letter from jail, Taylor told his girlfriend, "Joey is in Bradley County. I never hear from him. So many people want[ ] to do something to him. Next time I go to trial, I bet he won’t testify against me. Trust me on that!” (App. 221.)

. The majority concludes the hearsay statements are reliable, although it also concludes Dr. Cunningham's testimony is unreliable because "the facts he related [came] from second, third, or fourth hand sources ... [that were] not available for questioning at trial.” Maj. Op. 359. These conclusions are inconsistent.

. Although Marshall testified he stored the .38 revolver in the Impala’s center console, Matthews stated that Taylor retrieved the weapon from Marshall during a stop in Tennessee. (App. 142.)

. I note that in the guilt phase, when given the option to find either or both that Luck's murder "was willful, deliberate, malicious, and premeditated” and/or that the murder was committed during the perpetration of a kidnapping, the jury chose only to find the latter. The jury's sentencing phase finding of substantial planning and premeditation is at odds with its refusal to so find earlier.

. Section 924(c)(3) defines "crime of violence" as:
[A]n offense that is a felony and ... (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.
18 U.S.C. § 924(c)(3).
The ACCA defines "violent felony” as:
[A]ny crime punishable by imprisonment for a term exceeding one year ... that— (i) has as an element the use, attempted use, or threatened use of physical force against the person of another [ ("use of force clause”)]; or (ii) is burglary, arson, extortion, involves use of explosives [ ("enumerated offense clause”) ], or otherwise involves conduct that presents a serious potential risk of physical injury to another [(“residual clause”)].
18 U.S.C. § 924(e)(2)(B).

. Indeed, the majority in Stout did not adopt the dissent's position, which relied on many of the same distinctions the majority makes today. See 706 F.3d at 710-12 (Donald, J., dissenting).

. Additionally, to the extent Leocal recognized a distinction between language similar to the ACCA residual clause and § 16(b), it did so in the context of holding that § 16(b) does not encompass negligent or accidental conduct, such as driving under the influence of alcohol (DUI). See 543 U.S. at 10 n. 7, 125 S.Ct. 377. Later Supreme Court cases, however, made the same distinction in the ACCA context, holding that the ACCA's residual clause similarly excluded such conduct. In Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), the Court relied in part on Leocal to hold that DUI was not a "violent felony” under the ACCA's residual clause because it did not involve "purposeful, 'violent,' and 'aggressive' conduct.” Id. at 145-46, 128 S.Ct. 1581. Although the Supreme Court later noted in Sykes v. United States, 564 U.S. 1, 131 S.Ct. 2267, 2275-76, 180 L.Ed.2d 60 (2011), overruled by Johnson v. United States, - U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), that Begay's focus on "purposeful, violent, and aggressive” conduct was not required by the residual clause's text, it did so to distinguish Begay’s analysis of the strict-liability crime of DUI from the case before it, where the statute at issue had a "stringent [knowing or intentional] mens rea requirement.” Indeed, Sykes suggested that an inquiry into whether an offense requires "purposeful, violent, and aggressive” conduct would still be relevant to evaluate whether "strict liability, negligence, and recklessness crimes” constitute violent felonies under the residual clause. See id. at 2275-76; see also id. at 2289 n. 1 (Kagan, J., dissenting) (“[U]n-derstand[ing] the majority to retain the 'purposeful, violent, and aggressive’ test, but to conclude that it is 'redundant' in this case.”); United States v. Mitchell, 743 F.3d 1054, 1061 (6th Cir.2014).

. Although a fact-centric approach might make sense in the § 924(j) context because the statute addresses present rather than past conduct, which would enable a fact-finder to focus on the risk presented by the nature of a defendant’s actual conduct, case law squarely holds that the language of § 924(c) requires courts to use a categorical approach. See Leocal, 543 U.S. at 7, 125 S.Ct. 377 (observing that because [§ 16] directs our focus to the 'offense’ of convictionf,] the court must "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the] crime”); Evans, 644 F.3d at 453 (relying on Leocal and applying the categorical approach to § 924(c) crime-of-violence inquiry); see also United States v. McGuire, 706 F.3d 1333, 1336-37 (11th Cir.2013) (noting that the court employs a categorical approach to determine if an offense is a "crime of violence” under § 924(c)(3)(B) because of the phrase "by its nature”); United States v. Velazguez-Overa, 100 F.3d 418, 420 (5th Cir.1996) ("[T]he phrase 'by its nature’ compels a categorical approach to determining whether an offense is a crime of violence under Section 16(b).”).